NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a1312n.06

No. 11-2495

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**

***Dec 28, 2012***

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | **ON APPEAL FROM THE UNITED** |
| | ) | **STATES DISTRICT COURT FOR** |
| **v.** | ) | **THE EASTERN DISTRICT OF** |
| | ) | **MICHIGAN** |
| **STEVEN JOHNSON,** | ) | |
| | ) | |
| **Defendant-Appellant.** | ) | |

**BEFORE:  McKEAGUE and GRIFFIN, Circuit Judges; DLOTT, District Judge.**[*]

**SUSAN J. DLOTT, District Judge**.  Defendant-appellant Steven Johnson was convicted after a jury trial of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Johnson now appeals his conviction, challenging both the district court's denial of his motion to suppress the weapon and the district court's denial of his motion to exclude the 911 recording from evidence at trial.  For the following reasons, we affirm the district court on both rulings.

## I.  FACTUAL BACKGROUND

At 1:47 a.m. on August 20, 2010, a 911 operator received a call from an individual who reported that a man with a gun was walking southbound on Gratiot Avenue in Detroit, heading towards McDougall Street from Mack Avenue.  R. 61-1, 911 Call Tr., Page ID # 778-79.  The caller described the man as a black male wearing a blue t-shirt and dark-colored shorts.  *Id*. at Page ID #

---

[*] The Honorable Susan J. Dlott, Chief United States District Judge for the Southern District of Ohio, sitting by designation.

778. The caller stated that the gun appeared to be a MAC-10. *Id*. Based on this information, police dispatch put out a call for officers to respond to the situation.

Detroit Police Officers Cylvester Hill and Darryl Davis, who were patrolling the area of Gratiot in a fully marked scout car, received the call. R. 17, Mot. to Suppress Hr'g Tr., Page ID # 67. The testimony given by the officers differs on what information was relayed in the call. Officer Hill testified that the dispatcher said that a black male wearing dark colors and shorts was heading southbound on Gratiot from Mack carrying a possible MAC-10. *Id*. at Page ID # 62-63. Officer Davis testified that the dispatcher said a person was brandishing a firearm at or near the Marathon gas station on Gratiot and Mack, and also that the person appeared to be heading southbound on Gratiot. *Id*. at Page ID # 98. Officer Davis also testified that the dispatcher described the person as a black male of medium build, standing 5'10" or 5'11," wearing a black shirt and blue jean shorts. *Id*.

Because Officers Hill and Davis were near the area of Gratiot and Mack, they responded to the call. The officers drove to the intersection of Gratiot and Mack and pulled into the Marathon gas station. Finding nothing suspicious, the officers continued heading southwest on Gratiot. As the officers approached the intersection of Gratiot and Dubois Street, Officer Hill observed a black male wearing a black shirt and blue shorts, later identified as Johnson, walking southwest on Gratiot. *Id*. at Page ID # 66-68. The officers observed no other individuals walking in this area. *Id*. at Page ID # 66.

Officer Hill observed that Johnson was walking with an unusual gait, "with his legs . . . a little bit further apart than normal . . . as though he appeared to be holding his pants up." *Id*. at Page ID # 67. As the officers drove the scout car parallel to Johnson, Officer Hill noticed a bulge in the front of Johnson's shirt "protruding a nice amount." *Id*. Officer Hill also noticed that the bulge

2

moved back and forth as Johnson walked. *Id*. at Page ID # 94. At that time, Officer Hill told Officer Davis that he believed that Johnson had a weapon. *Id*. at Page ID # 69. The officers passed Johnson, made a U-turn (heading northeast on Gratiot), then made another U-turn (heading southwest on Gratiot) to position their vehicle behind Johnson. *Id*. at Page ID # 103. As the officers approached Johnson for the second time, Johnson turned to look at the scout car and Officer Hill again observed the bulge protruding from Johnson's waistband. *Id*. at Page ID # 70. Officer Hill then activated the scout car's lights, stopped the car, jumped out with his weapon drawn and pointed down, and instructed Johnson to stop. *Id*. at Page ID # 69, 89.

Johnson immediately stopped. One or both of the officers ordered Johnson to place his hands on top of his head. *Id*. at Page ID # 85-86. Johnson complied. Officer Davis approached Johnson, stood behind him, and placed his right hand on top of Johnson's interlaced fingers. *Id*. at Page ID # 105. Officer Hill then holstered his weapon and completed a patdown search. *Id*. at Page ID # 70. He felt a "very large bulge" in the front of Johnson's shirt. *Id*. at Page ID # 71. Officer Hill lifted Johnson's shirt and found a "9 millimeter high point rifle with . . . the stock part cut off." *Id*. Officer Hill recovered the weapon from Johnson's waistband and placed it in the trunk of the scout car. *Id*. at Page ID # 72. The officers also found a pair of green gloves in Johnson's rear pocket. *Id*. at Page ID # 129. The officers then advised Johnson that he was under arrest and placed him in handcuffs. The duration of the stop – from when the officers exited the scout car to when the officers discovered the weapon – lasted somewhere between twenty seconds and three minutes. *Id*. at Page ID # 72, 130.

Johnson was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Prior to trial, Johnson moved to suppress the firearm, claiming that the seizure of the weapon was unconstitutional because the officers lacked reasonable suspicion to stop and search

3

him. Alternatively, Johnson argued that the officers exceeded the permissible scope of the search. The district court held an evidentiary hearing on the motion, during which Officers Hill and Davis testified for the Government.

At the suppression hearing, Officer Hill was cross-examined on various inconsistencies in his testimony as compared with his arrest report. Specifically, defense counsel questioned Officer Hill about the following points: (1) the arrest report failed to mention that Officer Hill observed Johnson walking with an unusual gait, *id*. at Page ID # 82; (2) the arrest report failed to mention that Officer Hill told Officer Davis that he suspected that Johnson was armed, *id*. at Page ID # 84; and (3) the arrest report failed to mention a patdown search and, instead, states only that Officer Hill approached Johnson and lifted his shirt, *id*. at Page ID # 88. Officer Hill acknowledged the deficiencies in his report but stood by the veracity of his testimony at the suppression hearing. Officer Hill also attempted to make clear that he lifted Johnson's shirt while conducting the patdown search. *Id*. at Page ID # 92.

Officer Davis also was cross-examined about inconsistencies between his testimony at the suppression hearing, his statements in the arrest report, and his testimony at the preliminary hearing. Specifically, while Officer Davis testified at the suppression hearing that Officer Hill performed the patdown search and retrieved the weapon, his arrest report indicates that he (Officer Davis) conducted the search and lifted Johnson's shirt. *Id*. at Page ID # 122. Similarly, at the preliminary hearing Officer Davis was asked, "When you patted him down, did you recover anything from this person?" *Id*. at Page ID # 125. Officer Davis responded, "Yes." *Id*. Defense counsel argued that this evidence indicated that it was Officer Davis—not Officer Hill—who performed the search and retrieved the weapon, which directly contradicts the testimony of both officers at the suppression

4

hearing. Because of these conflicting statements, defense counsel argued that the officers were not credible.

In an oral ruling, the district court denied the motion to suppress. *Id*. at Page ID # 147. The court noted the conflicting testimony but found the inconsistencies in the officers' statements "more semantic in nature" and the result of sloppiness rather than untruthfulness. *Id*. at Page ID # 145. The district court credited the testimony of the officers and, based on that testimony, found the search of Johnson's person a lawful patdown authorized by *Terry v. Ohio*, 392 U.S. 1 (1968).

Before trial, Johnson also sought to exclude the recorded 911 call. The district court denied Johnson's motion to exclude, finding that the recorded conversation was nontestimonial and admissible as a present sense impression. R. 57, Trial Tr., Page ID # 413. The district court permitted the 911 tape to be played for the jury.

Johnson was subsequently convicted and sentenced to 96 months in prison. This timely appeal followed.

## II. ANALYSIS

### A. Motion to Suppress the Firearm

We review the denial of a motion to suppress for clear error as to factual findings and *de novo* as to conclusions of law. *United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004). If the district court denied the motion to suppress, then we must "view the evidence in the light most favorable to the government." *United States v. Smith*, 549 F.3d 355, 359 (6th Cir. 2008). A factual finding is clearly erroneous when, although there is evidence to support the finding, we are left with the definite and firm conviction that a mistake has been committed. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985). If there are two permissible views of the evidence, the district court's determination between them cannot be clearly erroneous. *Id*.

5

**1. Reasonable Suspicion to Justify the Stop**

Johnson first contends that the district court erred when it determined that the officers had reasonable suspicion to justify the stop itself. We disagree.

In *Terry*, the Supreme Court held that in the interest of safety, a police officer may stop a person in the absence of probable cause under certain circumstances. 392 U.S. 1, 27. Specifically, a police officer may conduct a brief investigatory stop, a *Terry* stop, of a person if the officer has a reasonable suspicion, supported by specific articulable facts, that criminal activity has occurred or is about to occur. *United States v. Atchley*, 474 F.3d 840, 847 (6th Cir. 2007). When evaluating an investigatory *Terry* stop, this court engages "in a two-part analysis of the reasonableness of the stop." *United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006) (quoting *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005)). "'We first ask whether there was a proper basis for the stop' and, if the stop was proper, 'then we must determine whether the degree of intrusion ... was reasonably related in scope to the situation at hand.'" *United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010) (quoting *Caruthers*, 458 F.3d at 464). This determination is made in light of the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

In this case, the totality of the circumstances are as follows: (1) an anonymous caller reported that a black male wearing dark colors and shorts and carrying a firearm was walking southbound on Gratiot; (2) the officers responded and observed a black male wearing a black shirt and blue shorts walking southwest on Gratiot; (3) the officers observed no one else walking in the area; (4) one of the officers, Officer Hill, observed that the man was walking with an unusual gait; and (5) Officer Hill observed a bulge in the front of the man's shirt that moved back and forth when he walked, which Officer Hill believed to be a weapon. Thus, at the time of the stop, Officer Hill observed that

6

Johnson—an individual whose general appearance and location matched the description given in the anonymous call—was walking with an unusual gait and had a bulge protruding from his waistband. In their totality, these circumstances amount to a sufficient justification for making a *Terry* stop.

On appeal, Johnson attacks the district court's factual determinations, arguing that the district court should have discredited the testimony of both officers as inconsistent and unreliable. Absent their testimony, Johnson argues, the government could not prove that the officers had reasonable suspicion to stop Johnson. Specifically, Johnson questions the officers' credibility and pinpoints the following topics on which he claims the officers testified inconsistently: (1) Officer Hill did not include in his report that Johnson walked with an unusual gait; (2) Officer Hill did not include in his report that he told Officer Davis that he suspected Johnson was armed; (3) Officer Hill's report makes no mention of a patdown search; (4) Officer Davis testified that the dispatcher included the suspect's height and weight, which differs from Officer Hill's testimony; and (5) Officer Davis wrote in his report and testified at an earlier preliminary hearing that he—not Officer Hill—conducted the search.

The district court addressed these inconsistencies in the officers' testimony, stating:

> As I heard these officers, I do have to say that they were both in preparing the reports and in their testimony . . . pretty sloppy. I don't believe they came here to lie about what occurred, or lie about their observations.
> . . . .
> So much of what is seen by [defense counsel] from his point of view to be inconsistencies translated to lying on the stand, the Court sees as sloppiness, and also I guess some evidence that can enhance the testimony to indicate that these two officers were not getting together to make sure that the stories measured perfectly, and recognizing that in incidents like this which had to be somewhat intense, that is, where the officers approaching someone that they believe may be armed, are themselves somewhat excited, that people hear and see thing[s] differently, report them differently certainly in writing the reports, and maybe [in a] less desirable manner than we would like for an officer to record their observations, but again,

none of that I think defeats the ultimate assessment of the circumstances which the Court finds more than enough to establish reasonable suspicion and reasonable search to accompany the approach of Mr. Johnson at that time of the night on Gratiot.

R. 17, Mot. to Suppress Hr'g Tr., at Page ID # 145-47.

We afford great deference to the district court's credibility determinations regarding witness

testimony. *United States v. Hinojosa*, 606 F.3d 875, 882 (6th Cir. 2010).

With regard to *Terry*-stop analysis in particular, although the standard of review on the ultimate reasonable suspicion inquiry is *de novo*, the district court is at an institutional advantage, having observed the testimony of the witnesses and understanding local conditions, in making this determination. Accordingly, due weight should be given to the inferences drawn from the facts by resident judges.

*Caruthers*, 458 F.3d at 464 (internal quotation marks, citations, and alteration omitted).

Examination of the hearing testimony reveals that some factual conflicts existed in the

officers' testimonies, particularly with regard to which officer conducted the patdown search, and

that the officers failed to include certain details in their arrest reports. The district court credited the

testimony of Officer Hill on the issue of who conducted the patdown search, attributing any apparent

conflict in the officers' testimonies to "semantics" or carelessness. R. 17, Mot. to Suppress Hr'g

Tr., Page ID # 145-46. Having observed the officers and their "demeanor and . . . manner of

responding to the questions," the district court concluded that the officers simply weren't "careful"

in their responses. *Id*. at Page ID # 145-46. Along the same vein, the district court attributed the

omissions from the officers' arrest reports to "sloppiness." *Id*. at Page ID # 145, 147. Although the

officers' testimonies were less than ideal, the district court ultimately determined that the officers

were credible. *Id*. at Page ID # 145.

Given the "considerable deference" accorded to a district court's factual findings and credibility determinations, *United States v. Moses,* 289 F.3d 847, 851 (6th Cir. 2002), we conclude that the district court did not err in crediting the officers' testimony.

## 2. Scope of the Stop

Johnson next contends that the actions of the officers exceeded the limits of a *Terry* stop and rose to the level of an arrest, which was not supported by the more stringent probable cause standard. Johnson argues that the *Terry* stop ripened almost immediately into a de facto arrest when (1) Officer Hill jumped out of the scout car with his weapon drawn, (2) the officers told Johnson not to move, and (3) the officers instructed Johnson to put his hands on top of his head.

Although no bright line distinguishes an investigative detention from an arrest, *Florida v. Royer*, 460 U.S. 491, 506 (1983), officers may not "seek to verify their suspicions by means that approach the conditions of arrest." *Id*. at 499. The factors we have considered in deciding whether that line has been crossed include transportation to another location, significant restraints on freedom of movement involving physical confinement or other coercion, and the use of weapons or bodily force. *United States v. Lopez–Arias*, 344 F.3d 623, 627 (6th Cir. 2003). However, we also have held that an officer's display of his weapon does not exceed the bounds of a *Terry* stop when reasonably necessary for the protection of the officers or to effectuate the investigatory stop. *See Houston v. Clark Cnty. Sheriff Deputy John Does 1–5*, 174 F.3d 809, 814–15 (6th Cir. 1999).

In this case, the officers' actions were reasonably necessary to effectuate the stop and to protect their safety. At the time of the stop, the officers suspected that Johnson was armed. To protect himself and Officer Davis from a potentially dangerous situation, Officer Hill drew his

9

weapon, pointed it down, and instructed Johnson to stop. R. 17, Mot. to Suppress Hr'g, Page ID # 69, 89. One or both of the officers then ordered Johnson to place his hands on top of his head. *Id*. When Johnson complied, Officer Hill holstered his weapon. *Id*. at Page ID # 70. These precautions were reasonably related to the investigation that initially warranted the stop and did not exceed the permissible scope of the *Terry* stop. As the district court determined, the officers "only acted prudently" to "protect themselves from danger," considering that they suspected that Johnson was armed. *Id*. at Page ID # 146-47.

We affirm the district court's denial of Johnson's motion to suppress the weapon.

**B. Motion to Exclude the 911 Recording**

Johnson also claims that the district court erred by denying his motion to exclude the 911 recording from evidence at trial because the recording contained inadmissible hearsay that violated the Sixth Amendment Confrontation Clause. The district court denied Johnson's motion on the grounds that the statements were nontestimonial and thus did not implicate the Confrontation Clause. The court also held that the recording was admissible as a present sense impression. We typically review a district court's evidentiary decisions for abuse of discretion. *United States v. Mayberry*, 540 F.3d 506, 515 (6th Cir. 2008). However, a claim that the admission of evidence violates the Confrontation Clause is reviewed *de novo*. *Id*. at 515.

We first address Johnson's Confrontation Clause challenge. The Confrontation Clause prohibits the admission of testimonial statements of a witness who did not testify at trial unless he was unavailable to testify and the defendant had a prior opportunity for cross-examination. *Davis v. Washington*, 547 U.S. 813, 821 (2006). The Confrontation Clause does not apply, however, to nontestimonial statements. *Whorton v. Bockting*, 549 U.S. 406, 420 (2007). In *Davis*, the Supreme Court held that "[s]tatements are nontestimonial when made in the course of police interrogation

under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." 547 U.S. 813 at 822. In examining the "circumstances" of the interrogation, the Court considers whether an ongoing emergency existed and the formality of the encounter, including the nature of what was asked and answered. *Michigan v. Bryant*, —— U.S. ——, ——, 131 S.Ct. 1143, 1162 (2011).

Here, the anonymous caller called 911 after he witnessed a man walking down Gratiot with what appeared to be a MAC-10. Although the caller initially states that "there's not no problem," he goes on to describe an ongoing situation requiring police assistance: "He's going towards McDougal and Gratiot. He got a gun. . . . He's walking towards McDougal now." R. 61-1, 911 Call Tr., Page ID # 778-79. The dispatcher's questions were aimed at soliciting information on the suspect's physical description, his current whereabouts, and the type of weapon he may have been carrying. The district court found that the caller's statements in response to the 911 operator's questions were nontestimonial because the primary purpose of the questioning was to enable police assistance in response to an ongoing emergency. R. 57, Trial Tr., Page ID # 414-15. We find no error in this conclusion.

We also conclude that the district court properly admitted the 911 recording into evidence pursuant to Rule 803(1) of the Federal Rules of Evidence, which provides that "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter" is not hearsay. Here, the anonymous caller described the event immediately after perceiving it. This is evident from the 911 transcript, as the caller describes the exact location of the individual carrying the gun. R. 61-1, 911 Call Tr., Page ID # 778-79. This 911 call, made "immediately []after" witnessing the described event, meets the definition of a present sense impression under Rule 803(1).

## III. CONCLUSION

For these reasons, we AFFIRM.