STEPHENS, Judge.
 

 *614
 
 Defendant Christopher Allen McKiver appeals from the judgment entered upon his conviction for one count of possessing a firearm as a convicted felon following a jury trial in New Hanover County Superior Court. McKiver argues that the trial court committed reversible error, in
 
 *615
 
 violation of his rights under the Sixth Amendment to the United
 
 *87
 
 States Constitution to confront the witnesses against him, when it denied his motion
 
 in limine
 
 to exclude evidence of an anonymous 911 call and the subsequent 911 dispatcher's call back. McKiver also contends that the trial court erred in denying his motion to dismiss. We hold that although the trial court did not err in denying his motion to dismiss, McKiver is entitled to a new trial because the erroneous admission of testimonial statements violated his Sixth Amendment rights and was not harmless.
 

 Factual Background
 

 At 9:37 p.m. on 12 April 2014, Wilmington Police Department ("WPD") Officer Scott Bramley was dispatched to Penn Street in the Long Leaf Park subdivision in response to an anonymous 911 caller's report that there was a possible dispute and a black man with a gun standing outside. Bramley activated his patrol car's blue lights and siren on his way to the scene, stopped a few blocks away to retrieve his patrol rifle from the vehicle's trunk, then proceeded to Penn Street and parked on the left side of the roadway. As he exited his vehicle, Bramley noticed two individuals standing near a black Mercedes that was parked beside a vacant lot. The Mercedes was still running, and Bramley could hear music "blaring" from its radio as he approached the two individuals, one of whom was a black male wearing a red and white plaid shirt, jeans, and a hat, who began to walk toward Bramley. Although Bramley had not yet received any description of the suspect, he "confronted [the man in the plaid shirt] about possibly having [a firearm], at which point he lifted his shirt to show [Bramley] he did not have a gun." After performing a pat-down to confirm that the man was unarmed, Bramley let him go and continued his investigation.
 

 By this time, several other WPD officers had arrived on the scene, which Bramley would later describe as "very dark" due to the "very sporadic" street lighting in the area. Bramley observed there were a number of other individuals watching from nearby residences and walking around near the vacant lot, perhaps 100 yards away from the Mercedes. After a few moments, Bramley asked the New Hanover County 911 dispatcher for a better description of the suspect, was informed that the anonymous 911 caller had already disconnected, and requested the dispatcher to initiate a call back. After reconnecting with the anonymous 911 caller, the dispatcher reported to Bramley that "[s]he said it was in a field in a black car," and that "[s]omeone said he might have thrown the gun." Several WPD officers searched for the gun in the vacant lot and eventually discovered a Sig Sauer P320 .45 caliber handgun located approximately 10 feet away from the Mercedes. Meanwhile, after Bramley told
 
 *616
 
 the dispatcher he had located a black Mercedes and asked whether the caller had provided a description of the suspect, the dispatcher replied, " Black male, light plaid shirt. He was last seen by the car with a gun in his hand and the [caller] went inside." Bramley later testified that upon receiving this information, he "immediately knew [the suspect] was the first gentleman that I had come into contact with because no one else in that area was wearing anything remotely similar to that clothing description." Bramley returned to his patrol car to see if he could pull a photograph off his vehicle's dashboard camera of the man he had patted down upon first arriving in order to relay it to officers
 
 en route
 
 to the scene, but was unable to do so. Shortly thereafter, McKiver approached the WPD officers who were searching the Mercedes and asked what they were doing to his car. Upon seeing the red plaid shirt McKiver was wearing, Bramley recognized him as the same black male he had patted down upon his arrival, concluded he met the description provided in the call back to the anonymous 911 caller, and placed McKiver under arrest.
 

 WPD officers subsequently determined that the Mercedes was registered to McKiver's brother in Elizabethtown and found a red bag in the vehicle's trunk containing cash and medications prescribed to McKiver. Although they found no fingerprints or DNA evidence on the firearm they found in the vacant lot, the officers traced its serial number to one that had been reported stolen from an individual in Elizabethtown.
 

 *88
 

 Procedural History
 

 On 22 September 2014, McKiver was indicted by a New Hanover County grand jury on one count of possession of a firearm by a felon and one count of possession of a stolen firearm. These matters came on for a jury trial in New Hanover County Superior Court on 27 April 2015, the Honorable Benjamin G. Alford, Judge presiding.
 

 Prior to jury selection, the trial court held a hearing on McKiver's motion
 
 in limine
 
 to exclude evidence of the anonymous 911 call and the dispatcher's call back. After noting the lack of any fingerprints or DNA found on the firearm and the lack of any eyewitness testimony that he had ever possessed it, McKiver contended that both calls amounted to testimonial hearsay and that their admission in evidence would violate his Sixth Amendment right to confront the witnesses against him. In response, the State argued that the calls were nontestimonial, and therefore properly admissible, because the statements they contained were made to enable police assistance to meet an ongoing emergency. The trial court denied McKiver's motion but granted his request for a continuing objection to the admission of this evidence in order to preserve the issue for appellate review.
 

 *617
 
 At trial, the State presented testimony from Bramley about the investigation he conducted in response to the initial 911 call and, over McKiver's timely objection, how he relied on the description provided during the dispatcher's call back of the suspect's shirt to identify and arrest McKiver. In addition to Bramley's testimony, the State introduced evidence of McKiver's prior felony conviction for possession with intent to sell or distribute marijuana; played a recording of the initial 911 call for the jury and admitted the 911 call logs into evidence; and also presented testimony from New Hanover County 911 communications manager Deborah Cottle, who explained how the 911 dispatch system works. WPD crime scene technician Max Cowart also testified and explained the procedures he followed for photographing and collecting evidence from the crime scene, and Elizabethtown resident Hunter Norris testified that the firearm recovered from the scene had belonged to his father before it was stolen.
 

 At the close of the State's evidence, McKiver moved to dismiss both charges for insufficient evidence but the trial court denied this motion. McKiver declined to put on any evidence and renewed his motion to dismiss, which the court again denied before providing jury instructions on both actual and constructive possession. The case was submitted to the jury on 29 April 2015. That same day, the jurors returned verdicts convicting McKiver on the charge of possessing a firearm as a convicted felon but acquitting him on the charge of possessing a stolen firearm. The court sentenced McKiver to 14 to 26 months imprisonment, suspended for 36 months of supervised probation after completion of a six-month active term. After sentencing, McKiver gave notice of appeal to this Court.
 

 Analysis
 

 Motion to dismiss
 

 We first address McKiver's argument that the trial court erred in denying his motion to dismiss the charge of possession of a firearm by a convicted felon. Specifically, McKiver argues that the court should have dismissed the charges against him because there was insufficient evidence of additional incriminating circumstances to support a jury verdict that he constructively possessed the firearm. We disagree.
 

 As this Court's prior decisions make clear, "[w]hen ruling on a defendant's motion to dismiss, the trial court must determine whether there is substantial evidence (1) of each essential element of the offense charged, and (2) that the defendant is the perpetrator of the offense."
 
 State v. Smith,
 

 186 N.C.App. 57
 
 , 62,
 
 650 S.E.2d 29
 
 , 33 (2007) (citations
 
 *618
 
 omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
 
 State v. Cummings,
 

 46 N.C.App. 680
 
 , 683,
 
 265 S.E.2d 923
 
 , 925 (citations omitted),
 
 affirmed,
 

 301 N.C. 374
 
 ,
 
 271 S.E.2d 277
 
 (1980). "[A]ll evidence admitted, whether competent or incompetent, must be considered in the light most favorable to the State, giving the State the benefit of every reasonable
 
 *89
 
 inference to be drawn from the evidence and resolving in its favor any contradictions in the evidence."
 
 State v. Worsley,
 

 336 N.C. 268
 
 , 274,
 
 443 S.E.2d 68
 
 , 70-71 (1994) (citation omitted). Thus, a defendant's motion to dismiss "is properly denied if the evidence, when viewed in the above light, is such that a rational trier of fact could find beyond a reasonable doubt the existence of each element of the crime charged."
 
 Id.
 
 at 274,
 
 443 S.E.2d at 71
 
 (citation omitted). This Court reviews the trial court's denial of a motion to dismiss
 
 de novo.
 

 Smith,
 

 186 N.C.App. at 62
 
 ,
 
 650 S.E.2d at 33
 
 .
 

 Section 14-415.1 of our General Statutes provides that "[i]t shall be unlawful for any person who has been convicted of a felony to purchase, own, possess, or have in his custody, care, or control any firearm[.]" N.C. Gen.Stat. § 14-415.1(a) (2015). "[T]he State need only prove two elements to establish the crime of possession of a firearm by a felon: (1)[the] defendant was previously convicted of a felony; and (2) thereafter possessed a firearm."
 
 State v. Perry,
 

 222 N.C.App. 813
 
 , 818,
 
 731 S.E.2d 714
 
 , 718 (2012) (citation omitted),
 
 disc. review denied,
 

 366 N.C. 431
 
 ,
 
 736 S.E.2d 188
 
 (2013). Possession of the firearm "may be actual or constructive. Actual possession requires that a party have physical or personal custody of the [firearm]. A person has constructive possession of [a firearm] when the [firearm] is not in his physical custody, but he nonetheless has the power and intent to control its disposition."
 
 State v. Alston,
 

 131 N.C.App. 514
 
 , 519,
 
 508 S.E.2d 315
 
 , 318 (1998) (citations omitted),
 
 superseded in part on other grounds by statute as stated in
 

 State v. Gaither,
 

 161 N.C.App. 96
 
 ,
 
 587 S.E.2d 505
 
 (2003),
 
 disc. review denied,
 

 358 N.C. 157
 
 ,
 
 593 S.E.2d 83
 
 (2004). However, where a defendant does not have "exclusive control of the location where the [firearm] is found, constructive possession of the [firearm] may not be inferred without other incriminating circumstances."
 
 State v. Clark,
 

 159 N.C.App. 520
 
 , 525,
 
 583 S.E.2d 680
 
 , 683 (2003) (citation and internal quotation marks omitted).
 

 In the present case, the evidence introduced at trial tended to show that McKiver had previously been convicted of a felony; that an anonymous 911 caller saw a man wearing a plaid shirt and holding a gun near a black car beside a field; that someone saw that man drop the gun;
 

 *619
 
 that upon his arrival at the scene, Bramley saw McKiver standing near a black Mercedes wearing a plaid shirt; that Bramley saw multiple individuals watching from nearby residences and walking near the vacant lot; that McKiver later returned to the scene and said the car was his; that although the car was registered to McKiver's brother in Elizabethtown, WPD officers found medication prescribed to McKiver himself in the trunk; and that the WPD officers found a firearm that had been reported stolen from Elizabethtown in the vacant lot approximately 10 feet away from the Mercedes.
 

 McKiver contends that because the firearm was found not in his possession but instead in a vacant lot that he did not maintain control over, the State failed to introduce sufficient evidence of incriminating circumstances from which it could be inferred that he constructively possessed the gun. However, this argument ignores the fact that the State also presented evidence that when Bramley arrived, McKiver was standing near the black Mercedes wearing a shirt similar to the one the anonymous caller described the man with the gun wearing before someone saw him drop it. Although McKiver takes issue with the admissibility of the initial 911 call and subsequent dispatcher's call back, our standard of review requires consideration of "all of the evidence actually admitted, whether competent or incompetent."
 
 State v. Jones,
 

 208 N.C.App. 734
 
 , 737,
 
 703 S.E.2d 772
 
 , 775 (2010) (holding that even though evidence was erroneously admitted in violation of the defendant's rights under the Confrontation Clause, it nevertheless "provid[ed] substantial evidence, for the purpose of [the] defendant's motion" to dismiss),
 
 vacated on other grounds,
 

 365 N.C. 467
 
 ,
 
 722 S.E.2d 509
 
 (2012) ;
 
 see also
 

 State v. Jones,
 

 342 N.C. 523
 
 , 540,
 
 467 S.E.2d 12
 
 , 23 (1996) ("[T]he fact that some of the evidence was erroneously admitted by the trial court is not a sufficient basis for granting a motion to dismiss.");
 
 State v. Littlejohn,
 

 264 N.C. 571
 
 , 574,
 
 142 S.E.2d 132
 
 , 134 (1965) ("Though the court below, in denying [the defendants'] motion for nonsuit, acted
 
 *90
 
 upon evidence which we now hold to be incompetent, yet if this evidence had not been admitted, the State might have followed a different course and produced competent evidence tending to establish [each element of the offense]."). Thus, even assuming
 
 arguendo
 
 that the trial court erred in admitting this evidence, it remains relevant to our analysis for purposes of this issue.
 
 [1]
 
 Because this evidence was sufficient to
 
 *620
 
 support a reasonable juror in concluding that additional incriminating circumstances existed-beyond McKiver's mere presence at the scene and proximity to where the firearm was found-and, thus, to infer that McKiver constructively possessed the firearm, we conclude the trial court did not err in denying McKiver's motion to dismiss.
 

 Confrontation Clause
 

 McKiver argues that the trial court erred in denying his motion to exclude evidence of the anonymous 911 call and the dispatcher's call back because admission of the testimonial hearsay they contained violated his rights under the Sixth Amendment's Confrontation Clause. We agree.
 

 "The standard of review for alleged violations of constitutional rights is
 
 de novo.
 
 "
 
 State v. Graham,
 

 200 N.C.App. 204
 
 , 214,
 
 683 S.E.2d 437
 
 , 444 (2009) (citation omitted),
 
 appeal dismissed,
 

 363 N.C. 857
 
 ,
 
 694 S.E.2d 766
 
 (2010). Once error is shown, the State bears the burden of proving the error was harmless beyond a reasonable doubt.
 
 See
 
 N.C. Gen.Stat. § 15A-1443(b) (2015).
 

 The Sixth Amendment to the United States Constitution provides in pertinent part that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. In
 
 Crawford v. Washington,
 
 the United States Supreme Court held that the Confrontation Clause forbids "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."
 
 541 U.S. 36
 
 , 53-54,
 
 124 S.Ct. 1354
 
 ,
 
 158 L.Ed.2d 177
 
 , 194 (2004). Although it did not provide a specific definition in
 
 Crawford
 
 of what makes a statement "testimonial," the Court offered clarification on this issue in its opinion consolidating two cases,
 
 Davis v. Washington
 
 and
 
 Hammon v. Indiana. See
 

 Davis v. Washington,
 

 547 U.S. 813
 
 , 822,
 
 126 S.Ct. 2266
 
 ,
 
 165 L.Ed.2d 224
 
 , 237 (2006).
 

 The statements at issue in
 
 Davis
 
 were made by the victim to a 911 operator as the defendant, her ex-boyfriend, attacked her and then fled the scene as soon as she identified him by name to the 911 operator.
 

 Id.
 

 at 818
 
 ,
 
 126 S.Ct. at 2271
 
 ,
 
 165 L.Ed.2d at 234
 
 . Although the victim did not testify at trial, the recording of the 911 call was admitted into evidence, and the defendant was convicted of violating a domestic no-contact order.
 
 See
 

 id.
 

 at 819
 
 ,
 
 126 S.Ct. at 2271-72
 
 ,
 
 165 L.Ed.2d at 235
 
 . The statements at issue in
 
 Hammon
 
 were made after police responded to a reported domestic disturbance at a residence to find the victim "alone on the front porch, appearing somewhat frightened."
 

 Id.
 

 (internal quotation marks omitted). When asked, however,
 
 *621
 
 the victim told the officers "nothing was the matter," and granted them permission to enter the home, wherein they found the defendant, her husband, in the kitchen.
 
 See
 
 id.
 

 While one officer remained with him, another questioned the victim in another room, where she gave a verbal description of what had happened and completed a form battery affidavit.
 
 See
 

 id.
 

 at 820
 
 ,
 
 126 S.Ct. at 2272
 
 ,
 
 165 L.Ed.2d at 235
 
 . Although the victim did not testify at trial, the defendant was convicted after the trial court admitted her affidavit into evidence and also allowed the officer who interviewed her to testify about what she told him.
 

 Id.
 

 at 820-21
 
 ,
 
 126 S.Ct. at 2272-73
 
 ,
 
 165 L.Ed.2d at 236
 
 .
 

 As the Court explained in
 
 Davis,
 

 [s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet
 
 *91
 
 an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
 

 Id.
 

 at 822
 
 ,
 
 126 S.Ct. at 2268-69
 
 ,
 
 165 L.Ed.2d at 237
 
 . The Court identified several factors relevant to the determination of whether a statement is testimonial, including: (1) whether the victim "was speaking about events
 
 as they were actually happening,
 
 rather than describing past events"; (2) whether a "reasonable listener" would recognize that the victim "was facing an ongoing emergency" and her "call was plainly a call for help against a
 
 bona fide
 
 physical threat"; (3) whether the questions asked and statements elicited by law enforcement "were necessary to be able to
 
 resolve
 
 the present emergency, rather than simply to learn ... what had happened in the past"; and (4) the contextual formality (or lack thereof) in which the victim's statements were made.
 

 Id.
 

 at 827
 
 ,
 
 126 S.Ct. at 2276
 
 ,
 
 165 L.Ed.2d at 240
 
 (citations and internal quotation marks omitted; emphasis in original).
 

 Based on this analytic framework, the Court held that the victim's statements to the 911 dispatcher in
 
 Davis
 
 were nontestimonial, and properly admissible, because they described events as they were happening, were made in the face of an ongoing emergency in a frantic environment that was neither tranquil nor safe, and provided information necessary to resolve the present emergency.
 

 Id.
 

 at 828-29
 
 ,
 
 126 S.Ct. at 2277-78
 
 ,
 
 165 L.Ed.2d at 240-41
 
 . In so holding, the Court nevertheless cautioned that what begins as a conversation to elicit information needed to render emergency assistance could become testimonial and therefore inadmissible.
 

 id="p622" href="#p622" data-label="622" data-citation-index="1" class="page-label">*622
 

 See
 

 id.
 

 at 828
 
 ,
 
 126 S.Ct. at 2277
 
 ,
 
 165 L.Ed.2d at 241
 
 ("This is not to say that a conversation which begins as an interrogation to determine the need for emergency assistance cannot, ..., evolve into testimonial statements, ..., once that purpose has been achieved.") (citations and internal quotation marks omitted). Such was the case in
 
 Hammon,
 
 the Court concluded, reasoning that the victim's statements were testimonial, and therefore inadmissible, because they were made "some time after the events described were over" and thus were part of an investigation into past conduct and were not necessary for police to resolve any ongoing emergency.
 

 Id.
 

 at 830
 
 ,
 
 126 S.Ct. at 2278
 
 ,
 
 165 L.Ed.2d at 242
 
 . As the Court explained in a footnote:
 

 Police investigations themselves are, of course, in no way impugned by our characterization of their fruits as testimonial. Investigations of past crimes prevent future harms and lead to necessary arrests. While prosecutors may hope that inculpatory "nontestimonial" evidence is gathered, this is essentially beyond police control. Their saying that an emergency exists cannot make it be so. The Confrontation Clause in no way governs police conduct, because it is the trial
 
 use
 
 of, not the investigatory
 
 collection
 
 of,
 
 ex parte
 
 testimonial statements which offends that provision. But neither can police conduct govern the Confrontation Clause; testimonial statements are what they are.
 

 Id.
 

 at 832 n. 6,
 
 126 S.Ct. at
 
 2279 n. 6,
 
 165 L.Ed.2d at
 
 243 n. 6 (emphasis in original).
 

 The North Carolina Supreme Court first applied the approach established in
 
 Davis
 
 in
 
 State v. Lewis,
 

 361 N.C. 541
 
 ,
 
 648 S.E.2d 824
 
 (2007). There, a police officer responded to the victim's call concerning a robbery at her apartment and took her statement, which included a description of the perpetrator, who the victim alleged had also assaulted her during the robbery, which had occurred several hours earlier.
 
 Id.
 
 at 543-44,
 
 648 S.E.2d at 826
 
 . The victim was taken to the hospital to treat her injuries and later that evening, she selected the defendant's photograph from a photographic line-up that another officer had assembled based in part on her statement.
 
 See
 
 id.
 

 The victim died prior to trial, but the trial court allowed both officers to testify about what the victim told them, and the defendant was convicted of assault with a deadly weapon inflicting serious injury, robbery with a dangerous weapon, and misdemeanor breaking and entering.
 
 See
 
 id.
 

 On appeal, the defendant argued that the officers' testimony violated her rights under the Confrontation Clause. After applying
 
 *92
 
 the
 
 *623
 
 framework outlined in
 
 Davis,
 
 our Supreme Court determined that at the time of her first statement, the victim "faced no immediate threat to her person"; that the officer "was seeking to determine what happened rather than what is happening"; that "the interrogation bore the requisite degree of formality"; that the victim's statement "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed"; and that the interrogation occurred "some time after the events described were over."
 
 Id.
 
 at 548,
 
 648 S.E.2d at 829
 
 (internal quotation marks omitted). The Court also observed that "[a]lthough [the] defendant's location was unknown at the time of the interrogation,
 
 Davis
 
 clearly indicates that this fact does not in and of itself create an ongoing emergency."
 
 Id.
 
 at 549,
 
 648 S.E.2d at 829
 
 (citation omitted). Consequently, the Court held that the statements were testimonial, and thus inadmissible under the Confrontation Clause, because the circumstances surrounding them objectively indicated that no ongoing emergency existed and that "the primary purpose of the interrogation was to establish or prove past events potentially relevant to a later criminal prosecution."
 

 Id.
 

 The Court ultimately concluded the defendant was entitled to a new trial because " we cannot say beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained" and also because "we cannot say beyond a reasonable doubt that the total evidence against [the] defendant was so overwhelming that the error was harmless[,]" given that the identification of the defendant as the perpetrator of the crimes alleged depended almost entirely on the victim's statements.
 
 Id.
 
 at 549,
 
 648 S.E.2d at 830
 
 (citations and internal quotation marks omitted).
 

 In the present case, the record before us does not include any recording or transcript of the initial anonymous 911 call or the dispatcher's call back. However, McKiver's counsel cross-examined Bramley extensively about these calls, and we find particularly relevant the following excerpt from the trial transcript in which Bramley testified about the statements made in the initial 911 call, as well as the actions he took in response to it and his observations upon arriving at the scene:
 

 Q. ... When you arrived on the scene, there was just the [Mercedes] and two guys up by the car; is that right?
 

 A. Yes, sir, off to the left.
 

 Q. Now, the original caller from 911 informed the dispatch and you that there was a black guy outside with a gun. Is that your understanding?
 

 *624
 
 A. Yes, sir. We were informed that there was an individual with a firearm and a possible dispute.
 

 Q. Possible dispute.
 

 A. Yes, sir.
 

 Q. You were also told [by the dispatcher] that the caller didn't know if the person was pointing [the gun] at anybody.
 

 A. We weren't advised whether or not they were pointing it, sir, we just know that they-there was someone with a firearm on-scene, as well as a possible dispute outside. I don't recall hearing whether or not they were pointing it.
 

 Q. Well, you listened to the 911 call, correct?
 

 A. I have listened to it as of today, yes, sir.
 

 Q. In fact, you're the way that the State introduced that into this trial; isn't that correct?
 

 A. Yes, sir.
 

 Q. Okay. Do you recall then that dispatch asked, "Okay. Is he pointing it at anyone?"
 

 A. That's correct.
 

 Q. And the response was, "I don't know."
 

 A. That's correct.
 

 Q. "I got away from the window." Then there's a question. Do you recall this? "Did you happen to see what he's wearing?" Do you recall that question?
 

 A. Yes, sir.
 

 Q. And her answer was, "No, I don't know what he's wearing." Do you recall that?
 

 *93
 
 A. I do.
 

 Q. And in addition to describ[ing] the scene, this caller describing the scene, "Do you hear anything right now? No, I just know they're out there." Do you recall that?
 

 *625
 
 A. Yes, sir.
 

 Q. "Okay," dispatcher says, "How many people were out there?" And do you recall that she answered, "It was people. I mean, it was just people outside. But he's-he's-I don't know what he's doing" ?
 

 A. Yes, sir.
 

 Q. "Okay, I mean, was he, like, around people or anything? He's walking around." Do you recall that?
 

 A. Yes, sir.
 

 Q. "Did you know what kind of gun? I don't know, I just saw a gun in his hand. It's dark outside." You didn't hear anything about waving the gun or brandishing the gun, it was "I just saw a gun in his hand." Isn't that correct as being your recollection?
 

 A. That's correct.
 

 Q. And she agreed with you, as you have described it yourself, that it was dark outside.
 

 A. That's correct.
 

 Q. Further question that was played here in the court in the trial from dispatch, "Do you hear anything else going on? Do you hear any arguments outside or anything?" "Uh-uh" was her answer. Do you recall that?
 

 A. That's correct.
 

 Q. And she concludes, pretty close to the conclusion [of the call], the dispatcher asks, "Do you want me to stay on the line 'til they get there?" talking about the police units. And the caller's response was, "No, I'll be fine."
 

 A. That's correct.
 

 Q. And when you arrived, those events appeared to have already happened, is that correct?
 

 A. Yes, sir.
 

 Q. Because there was no black man with a gun standing there in the street.
 

 A. That's correct.
 

 *626
 
 Q. There was-there were no people standing in a crowd around listening to music at that point; is that correct?
 

 A. That's correct.
 

 Q. It appeared that what [the caller] was describing had already happened; is that correct?
 

 A. Yes, sir.
 

 Q. She did not describe anything more about the person she was observing, the clothing.
 

 A. At that time, you're correct. Yes, sir.
 

 Q. When you arrived, it would appear that everything was pretty quiet, pretty calm; is that correct?
 

 A. Yes, sir.
 

 Our review of the record demonstrates that the circumstances surrounding both the initial 911 call and the dispatcher's subsequent call back objectively indicate that no ongoing emergency existed. Indeed, even before Bramley and other WPD officers arrived on the scene, the anonymous caller's statements during her initial 911 call-that she did not know whether the man with the gun was pointing his weapon at or even arguing with anyone; that she was inside and had moved away from the window to a position of relative safety; and that she did not feel the need to remain on the line with authorities until help could arrive-make clear that she was not facing any
 
 bona fide
 
 physical threat. Moreover, Bramley's testimony on cross-examination demonstrates that when he arrived at Penn Street, the scene was "pretty quiet" and "pretty calm." Although it was dark, Bramley and the other WPD officers had several moments to survey their surroundings, during which time Bramley encountered McKiver and determined that he was unarmed. While the identity and location of the man with the gun were not yet known to the officers when Bramley requested the dispatcher to initiate a call back, our Supreme Court has made clear that "this fact alone does not in and of itself create an ongoing emergency,"
 

 *94
 

 Lewis,
 

 361 N.C. at 549
 
 ,
 
 648 S.E.2d at 829
 
 (citation omitted), and there is no other evidence in the record of circumstances suggesting that an ongoing emergency existed at that time. We therefore conclude the statements made during the initial 911 call were testimonial in nature.
 

 We reach the same conclusion regarding the statements elicited by the dispatcher's call back concerning what kind of shirt the caller saw
 
 *627
 
 the man with the gun wearing and the fact that someone saw the man drop the gun. Because these statements described past events rather than what was happening at the time and were not made under circumstances objectively indicating an ongoing emergency, we conclude that they were testimonial and therefore inadmissible. In our view, this case presents the same scenario the
 
 Davis
 
 Court cautioned against, insofar as what began "as an interrogation to determine the need for emergency assistance ... evolve[d] into testimonial statements, ..., once that purpose ha[d] been achieved."
 
 547 U.S. at 828
 
 ,
 
 126 S.Ct. at 2277
 
 ,
 
 165 L.Ed.2d at 241
 
 . We emphasize that our conclusion here should by no means be read as a condemnation of Bramley or the other WPD officers, who reacted professionally and selflessly to a potentially dangerous situation. Nevertheless, as Justice Scalia explained in
 
 Davis,
 
 the harm the Confrontation Clause aims to prevent is the
 
 use
 
 of testimonial hearsay at trial, rather than its
 
 collection
 
 by law enforcement, and our inquiry on this issue is an objective one, rather than a determination from an officer's perspective.
 
 See
 

 id.
 

 at 832 n. 6,
 
 126 S.Ct. at
 
 2279 n. 6,
 
 165 L.Ed.2d at
 
 243 n. 6 ("While prosecutors may hope that inculpatory "nontestimonial" evidence is gathered, this is essentially beyond police control. Their saying that an emergency exists cannot make it be so."). Consequently, we hold that the trial court erred by denying McKiver's motion
 
 in limine
 
 to exclude the testimonial statements from the initial 911 call and the dispatcher's subsequent call back.
 

 The State contends this error was harmless but provides no specific arguments or citations to authority to support such a conclusion. At trial, the identification of McKiver as the man who held and then dropped the gun depended almost entirely on the testimonial statements elicited during the initial 911 call and the dispatcher's call back, and we cannot say beyond a reasonable doubt that the erroneous admission of this evidence did not contribute to the jury's verdict convicting McKiver of possessing a firearm as a convicted felon, or that the remaining evidence against McKiver, considered collectively, was "so overwhelming that the error was harmless."
 
 See
 

 Lewis,
 

 361 N.C. at 549
 
 ,
 
 648 S.E.2d at 830
 
 (citation omitted). Accordingly, we hold that McKiver is entitled to a
 

 NEW TRIAL.
 

 Judges HUNTER, JR., and INMAN concur.
 

 [1]
 

 Given our conclusion
 
 infra
 
 that McKiver is entitled to a new trial due to the violation of his Sixth Amendment rights, we note here that this evidence would clearly be inadmissible against McKiver at any subsequent trial, and thus would not be proper for the trial court to consider should the same inquiry arise again.