IN THE SUPREME COURT OF NORTH CAROLINA

No. 213PA16

Filed 9 June 2017

STATE OF NORTH CAROLINA

v.

CHRISTOPHER ALLEN MCKIVER

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision
of the Court of Appeals, ___ N.C. App. ___, 786 S.E.2d 85 (2016), finding prejudicial
error in a judgment entered on 29 April 2015 by Judge Benjamin G. Alford in Superior
Court, New Hanover County, and awarding defendant a new trial.  Heard in the
Supreme Court on 11 April 2017.

Joshua H. Stein, Attorney General, by Daniel P. O'Brien, Special Deputy
Attorney General, for the State-appellant.

Kimberly P. Hoppin for defendant-appellee.

NEWBY, Justice.

This case is about whether the Confrontation Clause prohibits the use at trial
of information received from an anonymous 911 caller who informed law enforcement
of a possible incident involving a firearm and described the suspect.  Because the
circumstances surrounding the 911 caller's statements objectively indicate that their
primary purpose was to enable law enforcement to meet an ongoing emergency, the
statements were nontestimonial in nature, thus not implicating the Confrontation

Clause. Accordingly, we reverse the decision of the Court of Appeals and reinstate the trial court's evidentiary ruling and the resulting judgment upon defendant's conviction.

At 9:37 p.m. on 12 April 2014, an anonymous 911 caller reported a possible dispute involving a black man with a gun in his hand who was standing outside on Penn Street in the Long Leaf Park subdivision of Wilmington, North Carolina. In response to the dispatch, Officer Scott Bramley of the Wilmington Police Department activated his patrol car's blue lights and siren on the way to the scene. Officer Bramley characterized the dispatch as "a pretty serious call" that is "always dispatched with backup." After stopping a few blocks away to retrieve his patrol rifle from his vehicle's trunk, he proceeded to Penn Street, where he parked on the side of the roadway. Penn Street was "very dark" with "very sporadic" street lighting, and Officer Bramley turned on his high-beam headlights "to try and light-up the area."

Upon exiting his vehicle, Officer Bramley noticed two people standing near a black, unoccupied Mercedes, which was still running and parked beside a vacant lot. Officer Bramley heard music "blaring" from the car radio. Lacking a detailed description of the suspect, Officer Bramley approached the two individuals. One of the individuals, a black male wearing a red and white plaid shirt and jeans, walked towards Officer Bramley. Officer Bramley "confronted him about possibly having [a firearm], at which point he lifted his shirt to show [Officer Bramley] he did not have a gun." Officer Bramley conducted a pat-down to confirm the man was unarmed and

then, having no description or location for the suspect, continued to investigate down the block.

By this time other officers had arrived on the scene, and Officer Bramley observed a number of onlookers watching from nearby residences and the vacant lot. Officer Bramley asked for a more detailed description of the suspect, but the dispatcher informed him that the anonymous 911 caller had already disconnected. Officer Bramley requested that the dispatcher initiate a reverse call. After reconnecting with the caller, the dispatcher informed Officer Bramley that the caller "said it was in the field in a black car and someone said he might have thrown the gun."

In response to Officer Bramley's request for a more detailed description from the caller, the dispatcher replied: "Black Male light plaid shirt. He was last seen by the car with a gun in his hand and then they all went in the house because they were afraid." Officer Bramley testified that, upon receiving this information, he "immediately knew [the suspect] was the first gentleman that [he] had come into contact with because no one else in that area was wearing anything remotely similar to that clothing description." Officer Bramley relayed the suspect's description "to other officers still en route to help search the area in an attempt to locate him." Officers searched the nearby vacant lot and discovered a Sig Sauer P320 .45 caliber handgun located about ten feet away from the Mercedes. The officers identified

defendant as the suspect based on the caller's description, and defendant was arrested.

Defendant was indicted, *inter alia*, on one count of possession of a firearm by a felon. Before trial defendant moved to exclude evidence of the initial 911 call and the dispatcher's reverse call, contending that admitting statements made during either call without requiring the anonymous caller to testify would allow the jury to hear inadmissible testimonial statements in violation of his Sixth Amendment right to confront the witnesses against him. The State successfully argued, however, that the statements primarily served to enable law enforcement to meet an ongoing emergency and were therefore nontestimonial in nature. *See Davis v. Washington*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). Along with the calls, the State introduced other evidence from the scene, including the firearm, and documentation verifying defendant's prior felony conviction. The jury convicted defendant of possessing a firearm as a convicted felon, and the trial court sentenced defendant to fourteen to twenty-six months of imprisonment, suspended for thirty-six months of supervised probation after completion of a six-month term. Defendant appealed.

On appeal the Court of Appeals concluded, *inter alia*, that the anonymous 911 call and the dispatcher's reverse call were inadmissible testimonial statements. *State v. McKiver*, ___ N.C. App. ___, ___, 786 S.E.2d 85, 94 (2016). According to the Court of Appeals, the 911 call was not placed in response to an "ongoing emergency" and

admitting the statements without requiring the anonymous caller to testify violated defendant's constitutional right to confront the witnesses against him.[1] *Id.* at ___, 786 S.E.2d at 93-94 (citing *Davis*, 547 U.S. at 828, 126 S. Ct. at 2277, 165 L. Ed. 2d at 240-41). Noting the anonymous 911 caller's "position of relative safety" in her home and away from her window, the Court of Appeals determined that the record did not objectively indicate that an ongoing emergency existed. *Id.* at ___, 786 S.E.2d at 93. Even though "the identity and location of the man with the gun were not yet known to the officers," according to the Court of Appeals, " 'this fact [alone] does not in and of itself create an ongoing emergency.' " *Id.* at ___, 786 S.E.2d at 93 (quoting *State v. Lewis*, 361 N.C. 541, 549, 648 S.E.2d 824, 829 (2007)). Moreover, the court concluded that receiving evidence of the calls could not be harmless because defendant's identification as the suspect rested almost entirely on these statements. *Id.* at ___, 786 S.E.2d at 94. While it emphasized that its conclusion should not be read to condemn the officers "who reacted professionally and selflessly to a potentially dangerous situation," the Court of Appeals ultimately held that the trial court erred by failing to exclude evidence concerning both the initial 911 call and the dispatcher's reverse call from evidence, and awarded defendant a new trial. *Id.* at ___, 786 S.E.2d at 94. This Court allowed discretionary review.

---

[1] The Court of Appeals first held that the incriminating circumstantial evidence sufficiently supported a jury verdict that defendant constructively possessed the firearm. *McKiver*, ___ N.C. App. at ___, 786 S.E.2d at 88-90. This issue is not before the Court.

We review a trial court's decisions regarding a defendant's allegations of constitutional violations de novo. *State v. Biber*, 365 N.C. 162, 168, 712 S.E.2d 874, 878 (2011). The Confrontation Clause of the Sixth Amendment to the Federal Constitution declares: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend VI. The Confrontation Clause prohibits the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 1365, 158 L. Ed. 2d 177, 194 (2004). The Confrontation Clause does not, however, apply to nontestimonial statements. *Whorton v. Bockting*, 549 U.S. 406, 420, 127 S. Ct. 1173, 1183, 167 L. Ed. 2d 1, 13 (2007).

In *Davis v. Washington* the United States Supreme Court defined "nontestimonial statements" and compared them to "testimonial statements":

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 822, 126 S. Ct. at 2273-74, 165 L. Ed. 2d at 237. The Court described an ongoing emergency as "a call for help against a bona fide physical threat" or "speaking

about events *as they were actually happening*, rather than 'describ[ing] past events.' " *Id.* at 827, 126 S. Ct. at 2276, 165 L. Ed. 2d at 240 (brackets in original) (quoting *Lilly v. Virginia,* 527 U.S. 116, 137, 119 S. Ct. 1887, 1900, 144 L. Ed. 2d 117, 135 (1999) (plurality opinion)). Statements made during a 911 call often describe "current circumstances requiring police assistance" rather than provide a narrative of past events. *Id.* at 827, 126 S. Ct. at 2276, 165 L. Ed. 2d at 240.

Moreover, the existence of an ongoing emergency and its duration "depend on the type and scope of danger posed to the victim, the police, and the public." *Michigan v. Bryant,* 562 U.S. 344, 371, 131 S. Ct. 1143, 1162, 179 L. Ed. 2d 93, 115 (2011). For example, assessing whether an emergency is ongoing, and is therefore a continuing threat to the public and law enforcement, "may depend in part on the type of weapon employed." *Id.* at 364, 131 S. Ct. at 1158, 179 L. Ed. 2d at 111 (reviewing statements made by a victim, mortally wounded during a nondomestic dispute in an exposed public location, that described and identified the fleeing gunman who posed a prospective threat to the general public).

"In addition to the circumstances in which an encounter occurs, the statements and actions of both the declarant and interrogators provide objective evidence of the primary purpose of the interrogation," taking into account that law enforcement officers serve as both first responders and interrogators. *Id.* at 367, 131 S. Ct. at 1160, 179 L. Ed. 2d at 112. Formal statements made in the course of police interrogation suggest the lack of such an emergency. *Id.* at 366, 131 S. Ct. at 1160,

179 L. Ed. 2d at 112; *accord Lewis*, 361 N.C. at 548, 648 S.E.2d at 829 (concluding that a victim's formal statements to police in her home after the commission of a crime and her photo identification of the defendant while she was at the hospital were testimonial). "[C]ourts should look to all of the relevant circumstances" and objectively evaluate "the statements and actions of all participants," including "the parties' perception that an emergency is ongoing." *Bryant*, 562 U.S. at 369-70, 131 S. Ct. at 1162, 179 L. Ed. 2d at 114-15.

Here the trial court properly determined that, based on the objective circumstances surrounding the 911 calls, an ongoing emergency existed. The primary purpose of the initial 911 call was to inform law enforcement of current circumstances: a possible dispute involving an unidentified man brandishing a firearm outside the caller's home on a public street in a residential subdivision. *See Davis*, 547 U.S. at 827, 126 S. Ct. at 2276, 165 L. Ed. 2d at 240 (A "call for help" is nontestimonial.). The caller reacted by going into her home and staying away from the window. Likewise, the officer retrieved his patrol rifle before entering the scene. As is evident from the precautions taken by both the 911 caller and the officers on the scene, they believed the unidentified suspect was still roving the subdivision with a firearm, posing a continuing threat to the public and law enforcement. *See Bryant*, 562 U.S. at 370-71, 131 S. Ct. at 1162, 179 L. Ed. 2d at 115 ("[T]he existence and duration of an emergency depend on the type and scope of danger posed to the victim, the police, and the public.").

To properly address the continuing threat, Officer Bramley requested that the dispatcher place a reverse call to ask for a more complete description of the individual and, once received, he quickly relayed that information to the other officers in an effort to locate and apprehend the suspect. Only after receiving this additional information from the reverse call were the officers able to find the weapon and identify the suspect. The 911 caller's description of the suspect's clothing and approximate location gave law enforcement the information that they needed to address an ongoing emergency. *See State v. Hewson*, 182 N.C. App. 196, 206-07, 642 S.E.2d 459, 466-67 (concluding that the victim's 911 call was nontestimonial because it "was not designed to establish a past fact, but 'to describe current circumstances requiring police assistance' " (quoting *Davis*, 547 U.S. at 827, 126 S. Ct. at 2276, 165 L. Ed. 2d at 240)), *disc. rev. denied*, 361 N.C. 572, 651 S.E.2d 229 (2007); *see also United States v. Johnson*, 509 F. App'x 487, 488-89, 494 (6th Cir. 2012) (concluding that an anonymous 911 caller's statement that "a black male wearing a blue t-shirt and dark-colored shorts" was carrying a gun and walking southbound down the street described "an ongoing situation requiring police assistance" and was therefore nontestimonial), *cert. denied*, ___ U.S. ___, 133 S. Ct. 2361, 185 L. Ed. 2d 1083 (2013). As a result, the anonymous 911 caller's statements here fit squarely within the definition of nontestimonial statements as defined in *Davis v. Washington*. Therefore, the statements are admissible without implicating the Confrontation Clause.

In sum, the circumstances surrounding the initial 911 call and the dispatcher's reverse call objectively indicate that the primary purpose of the dispatcher's questions and the caller's responses was to enable law enforcement to meet an ongoing emergency. As such, the statements were nontestimonial and did not trigger Sixth Amendment Confrontation Clause protection. Accordingly, we reverse the decision of the Court of Appeals on this issue and reinstate the trial court's evidentiary ruling and resulting judgment.

REVERSED.