STATE OF NORTH CAROLINA v. ANGELA DEBORAH LEWIS

No. 558PA04-2

(Filed 24 August 2007)

## Constitutional Law— right to confrontation—unavailable witness—testimonial statements

A review in light of *Davis v. Washington*, U.S. (2006), revealed that defendant's right to confrontation was violated in an assault with a deadly weapon inflicting serious injury, robbery with a dangerous weapon, and misdemeanor breaking and entering case, and she is entitled to a new trial based on the erroneous admission of testimonial evidence including the unavailable witness victim's statements to an officer in her home and her photo identification of defendant to a detective while at a hospital, because: (1) at the time the victim made her statement to an officer, she faced no immediate threat to her person, the officer was seeking to determine what happened rather than what was happening, the interrogation bore the requisite degree of formality because the officer questioned the victim as part of his investigation and outside defendant's presence, the victim's statement in response to police questioning deliberately recounted how potentially criminal past events began and progressed, and the interrogation occurred some time after the events described were over; (2) the circumstances surrounding the officer's interrogation of the victim objectively indicated that no ongoing emergency existed and that the primary purpose of the interrogation was to establish or prove past events potentially relevant to a later criminal prosecution; (3) although defendant's location was unknown at the time of the interrogation, this fact does not in and of itself create an ongoing emergency; (4) it cannot be said beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained when the victim was the only eyewitness to the crimes; and (5) it cannot be said beyond a reasonable doubt

that the total evidence against defendant was so overwhelming that the error was harmless when the identification of defendant as the perpetrator of the crimes depended almost entirely on the victim's statements and photo identification. The parties are free to develop the issue of forfeiture during defendant's new trial.

Justice HUDSON did not participate in the consideration or decision of this case.

On order of the United States Supreme Court entered 30 June 2006 granting defendant's petition for writ of certiorari to review our decision reported in 360 N.C. 1, 619 S.E.2d 830 (2005), vacating said judgment and remanding the case to this Court for further consideration in light of *Davis v. Washington,* —— U.S. ——, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). Heard on remand in the Supreme Court 17 October 2006.

*Roy Cooper, Attorney General, by Daniel P. O'Brien, Assistant Attorney General, for the State.*

*Paul M. Green for defendant-appellant.*

NEWBY, Justice.

Having originally decided this case concerning defendant's Confrontation Clause rights through the general approach provided by the United States Supreme Court in *Crawford v. Washington,* 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), we now address it under the specific guidance of *Davis v. Washington,* —— U.S. ——, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). We conclude that *Davis* controls and that defendant is entitled to a new trial, thereby modifying and affirming the decision of the Court of Appeals.

## I. BACKGROUND

Defendant was indicted for assault with a deadly weapon inflicting serious injury on eighty-year-old Nellie Joyner Carlson ("Carlson"); felony breaking and entering into Carlson's residence at 1312 Glenwood Towers, a public housing development for senior citizens located in Raleigh, North Carolina; and robbery of currency valued at approximately three dollars from Carlson perpetrated through use of a dangerous weapon at the time of the assault. The charges were consolidated for trial on 22 and 27 January 2003. Carlson, the only witness to the crimes, died before defendant's trial, and the State relied in part on the testimony of Officer Narley Cashwell

·("Cashwell") and Detective Mark Utley ("Utley") of the Raleigh Police Department regarding statements Carlson made during their investigation of the offenses.

At trial, Officer Cashwell testified that, after receiving a call at 5:43 p.m. on 22 November 2001 concerning a robbery, he went to Carlson's apartment. Upon his arrival, Officer Cashwell observed Carlson "sitting in a chair. . . . kind of hunched over." Before speaking with Carlson, he talked with Ida Griffin ("Griffin") and John Woods, two elderly friends and neighbors of Carlson. Officer Cashwell took a statement from Griffin that after several unsuccessful attempts to reach Carlson by telephone, she went to Carlson's apartment around 5:00 p.m. and found the door ajar, the apartment "tore up," and Carlson sitting in a chair. The exact timing of the incident between Carlson and defendant was not developed at trial, although the State posited it occurred during the afternoon sometime after 12:00 p.m. or 1:00 p.m. Officer Cashwell then spoke with Carlson, whose face and arms were badly bruised and swollen. Carlson complained of pain in her head, but seemed coherent and cognizant of her surroundings. She was able to get out of her chair and move around the room. At some point before taking a statement from Carlson, Officer Cashwell summoned Emergency Medical Services. Officer Cashwell testified, over defendant's objection, that in response to a series of questions he took the following statement from Carlson:

> I was in the hall opening my door. My door was locked. I—I was at the door and she slipped up behind me. She asked me for some money. I said what do I look like, the money tree. She said— she said, you don't like me because I'm black. I told her I don't like whatever color she was. I opened the door and she pushed me inside. She grabbed my hair and pulled my hair. She hit me with her fist. She also hit me with a flashlight, phone and my walking stick. She hit me in the ribs with my walking stick. She took a small brown metal tin that I had some change in. I also had some change on the table that she took. I know her. She comes up here all the time begging for money. She visits a man at the end of the hall. I don't know her name but he might.

Carlson also provided a brief description of her assailant.

Detective Utley testified that he was called to the scene later in the evening and was informed by Officer Cashwell that one of Carlson's neighbors, Burlee Kersey ("Kersey"), might know the name of the assailant. Detective Utley met with Kersey, who gave defend-

ant's name as the person Carlson had described. Detective Utley used defendant's picture and created a six-person photographic lineup that he took to Wake Medical Center, where Carlson was being treated for injuries sustained during the assault. He showed Carlson one photograph at a time and instructed her "the person that assaulted you or robbed you . . . may or may not be in this photographic lineup. This is something you would have to tell me." Detective Utley testified, over defendant's objection, that Carlson selected defendant's photograph and identified defendant as the person who assaulted and robbed her.

On 27 January 2003, the jury found defendant guilty of assault with a deadly weapon inflicting serious injury, robbery with a dangerous weapon, and misdemeanor breaking and entering, which is a lesser included offense of felonious breaking and entering. Defendant was sentenced to consecutive terms of 144 months minimum to 182 months maximum imprisonment for robbery with a dangerous weapon and 48 months minimum to 67 months maximum imprisonment for the remaining offenses. Defendant appealed, and on 19 October 2004 the Court of Appeals reversed defendant's convictions and awarded her a new trial, relying principally on *Crawford*, which was decided on 8 March 2004. The Court of Appeals did not reach defendant's argument that Carlson's statements to police should not have been admitted on hearsay grounds because it concluded the admissions of Carlson's statements violated defendant's rights under the Confrontation Clause. *State v. Lewis*, 166 N.C. App. 596, 600, 603 S.E.2d 559, 561 (2004). This Court allowed the State's petition for discretionary review, reversed the decision of the Court of Appeals, and remanded the case to that court for consideration of defendant's additional assignments of error. We concluded that under *Crawford*, Carlson's statements to Officer Cashwell were nontestimonial and thus their admission did not violate defendant's Confrontation Clause rights and that although Carlson's identification of defendant to Detective Utley was testimonial, its admission was harmless error because other "competent overwhelming evidence of defendant's guilt existed." *State v. Lewis*, 360 N.C. 1, 29, 619 S.E.2d 830, 848 (2005).

Defendant petitioned the United States Supreme Court for writ of certiorari. On 19 June 2006, that Court issued *Davis*, clarifying when statements made to police are testimonial. On 30 June 2006, that Court granted defendant's petition for writ of certiorari to review *Lewis*, vacated the judgment, and remanded the case to this Court for

further consideration in light of *Davis. Lewis v. North Carolina,* ——
U.S. ——, 126 S. Ct. 2983, 165 L. Ed. 2d 985 (2006).

## II. ANALYSIS

The Sixth Amendment to the United States Constitution provides
in part that "[i]n all criminal prosecutions the accused shall enjoy the
right . . . to be confronted with the witnesses against him." U.S. Const.
amend. VI. At the time of defendant's jury trial, *Ohio v. Roberts* gov-
erned Confrontation Clause analysis and allowed an unavailable wit-
ness's statement to be admitted against a criminal defendant if the
statement bore "adequate 'indicia of reliability.' " 448 U.S. 56, 66, 100
S. Ct. 2531, 2539, 65 L. Ed. 2d 597, 608 (1980). While defendant's direct
appeal was pending, the United States Supreme Court determined
that *Roberts* provided an incorrect application of the Confrontation
Clause. *Crawford,* 541 U.S. at 60, 124 S. Ct. at 1369, 158 L. Ed. 2d at
198. *Crawford* holds the Confrontation Clause forbids "admission of
testimonial statements of a witness who did not appear at trial unless
he was unavailable to testify, and the defendant had had a prior
opportunity for cross-examination." *Id.* at 53-54, 124 S. Ct. at 1365,
158 L. Ed. 2d at 194. The Court declined to endorse a particular defi-
nition of testimonial statements because it found the statements at
issue in *Crawford* "testimonial under even a narrow standard." *Id.* at
51-52, 68, 124 S. Ct. at 1364, 1374, 158 L. Ed. 2d at 193, 203.

In *Davis,* the Supreme Court consolidated two state cases, *Davis
v. Washington* and *Hammon v. Indiana,* which required the Court to
further define the testimonial nature of statements made to police
officers. The relevant statements in *Davis* were made to a 911 opera-
tor by the victim as she was being attacked by her former boyfriend.
*Davis,* —— U.S. at ——, 126 S. Ct. at 2270-71, 165 L. Ed. 2d at 234-35.
As soon as the victim identified the defendant by name, the defend-
ant ran out the door and left in a car. *Id.* at ——, 126 S. Ct. at 2271, 165
L. Ed. 2d at 234. The operator then asked the victim a series of ques-
tions about the defendant and the context of the assault. *Id.* at ——,
126 S. Ct. at 2271, 165 L. Ed. 2d at 234. The victim did not testify, and
the trial court, over the defendant's objection, admitted the recording
of the 911 call, redacted to remove references to a police visit to the
residence two days earlier. *State v. Davis,* 154 Wash. 2d 291, 296 &
n.1, 111 P.3d 844, 847 & n.1 (2005) (en banc). The Washington Court
of Appeals in affirming defendant's conviction found no error. *State
v. Davis,* 116 Wash. App. 81, 96, 64 P.3d 661, 669 (2003). The Supreme
Court of Washington affirmed, concluding that the portion of the call

identifying the defendant was nontestimonial and that in light of other untainted evidence, admission of any other portions of the call that may have been testimonial was harmless error. *Davis*, 154 Wash. 2d at 305, 111 P.3d at 851.

In *Hammon*, two police officers arrived at the home of a reported domestic disturbance to find the victim "alone on the front porch, appearing " 'somewhat frightened,' " but she told them ' "nothing was the matter." ' " *Davis*, —— U.S. at ——, 126 S. Ct. at 2272, 165 L. Ed. 2d at 235. After entering the house with permission, the officers found the defendant in the kitchen. *Id.* at ——, 126 S. Ct. at 2272, 165 L. Ed. 2d at 235. One of the officers remained with the defendant, while the other officer questioned the victim, who gave a verbal description of what happened and then completed a form battery affidavit by hand. *Id.* at ——, 126 S. Ct. at 2272, 165 L. Ed. 2d at 235. The victim did not testify, and the trial court, over the defendant's objection, admitted the victim's affidavit and allowed the officer to testify as to what the victim told him. *Id.* at ——, 126 S. Ct. at 2272, 165 L. Ed. 2d at 236. The Indiana Court of Appeals affirmed in relevant part. *Hammon v. State*, 809 N.E.2d 945, 953 (Ind. App. 2004). The Supreme Court of Indiana affirming, concluded that the victim's oral statement was nontestimonial and that admission of the affidavit was harmless error. *Hammon v. State*, 829 N.E.2d 444, 458-59 (Ind. 2005).

In order to resolve the specific situations before it, the United States Supreme Court held:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis*, —— U.S. at ——, 126 S. Ct. at 2273-74, 165 L. Ed. 2d at 237.

After noting that it was only asked to consider the statements from the 911 call that identified the defendant in *Davis*, the Court concluded that the circumstances in that case objectively indicated the primary purpose of the investigation that elicited the identifying statements was to enable police assistance to meet an ongoing emergency. The Court cited several factors in support of its decision: (1) the victim "was speaking about events as they were actually happen-

ing, rather than describing past events"; (2) the victim was facing an ongoing emergency and her "call was plainly a call for help against bona fide physical threat"; (3) "the elicited statements were necessary to be able to resolve the present emergency"; (4) the interrogation was very informal and the victim's "frantic answers were provided over the phone, in an environment that was not tranquil, or even . . . safe." *Id.* at ——, 126 S. Ct. at 2276-77, 165 L. Ed. 2d at 240 (citations, emphasis, brackets, and internal quotation marks omitted). Further examining the victim's statements, the Court emphasized that "[s]he simply was not acting as a *witness*; she was not *testifying*. What she said was not 'a weaker substitute for live testimony' at trial." *Id.* at ——, 126 S. Ct. at 2277, 165 L. Ed. 2d at 240-41 (citation omitted). Moreover, "[n]o 'witness' goes into court to proclaim an emergency and seek help." *Id.* at ——, 126 S. Ct. at 2277, 165 L. Ed. 2d at 241. The Court was clear to limit its analysis to the early statements made by the victim identifying the defendant and not the later parts of the 911 call, adding in dicta that "[i]t could readily be maintained" the ongoing emergency ended when the defendant left the victim's presence and the victim's subsequent statements to the 911 operator were testimonial. *Id.* at ——, 126 S. Ct. at 2277, 165 L. Ed. 2d at 241.

Turning to *Hammon*, the Court determined that the victim's statements to police were testimonial. Notwithstanding that flames were coming out of the shattered glass door of the home's living room gas heating unit and that the defendant repeatedly tried to intervene in the victim's conversation with the police, the Court determined that "[t]here was no emergency in progress" and that "[i]t is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct." *Id.* at ——, 126 S. Ct. at 2278, 165 L. Ed. 2d at 242. Several factors influenced the Court's decision including: (1) when the police arrived the victim "told them that things were fine"; (2) the victim faced "no immediate threat to her person"; (3) the officer questioning the victim "was not seeking to determine . . . 'what is happening,' but rather 'what happened' "; (4) the interrogation was "formal enough" because it was conducted in a separate room away from the defendant as part of a police officer's investigation; (5) the victim's statement "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed"; and (6) the interrogation occurred "some time after the events described were over." *Id.* at ——, 126 S. Ct. at 2278, 165 L. Ed. 2d at 242. These characteristics led the Court to conclude the victim's statements were "neither a cry for help

nor the provision of information enabling officers immediately to end a threatening situation," but were instead "an obvious substitute for live testimony, because they [did] precisely *what a witness does* on direct examination; they [were] inherently testimonial." *Id.* at ——, 126 S. Ct. at 2278-79, 165 L. Ed. 2d at 242-43.

Having revisited the case *sub judice* in light of *Davis*, we conclude that the United States Supreme Court's analysis of the circumstances surrounding the victim's statements in *Hammon* controls and that Carlson's statements to Officer Cashwell in her home and her photo identification of defendant to Detective Utley while at the hospital were testimonial. Because it is clear that Carlson's photo identification of defendant was testimonial, *see United States v. Billingslea*, 204 F. Appx. 856, 858 (11th Cir. 2006) (unpublished) (per curiam), our discussion will focus on Carlson's statements to Officer Cashwell.

The circumstances surrounding Carlson's statements to Officer Cashwell bear almost all the characteristics of those circumstances surrounding the victim's statements in *Hammon*. At the time she made her statement to Officer Cashwell: (1) Carlson faced no immediate threat to her person; (2) Officer Cashwell was seeking to determine "what happened" rather than "what is happening"; (3) the interrogation bore the requisite degree of formality because Officer Cashwell questioned Carlson as part of his investigation and outside defendant's presence; (4) Carlson's statement "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed"; and (5) the interrogation occurred "some time after the events described were over." *See Davis*, —— U.S. at ——, 126 S. Ct. at 2278, 165 L. Ed. 2d at 242.

Conversely, the circumstances surrounding Carlson's statements bear little resemblance to those circumstances the United States Supreme Court found relevant in its analysis of the *Davis* facts. Carlson was not speaking about events as they actually happened. She was not plainly calling for help while encountering a bona fide physical threat or facing an ongoing emergency. Therefore, the statements elicited by Officer Cashwell were not necessary to resolve an emergency. Finally, the environment in which Carlson provided answers to Officer Cashwell's questions was not chaotic or unsafe. *See id.* at ——, 126 S. Ct. at 2276-77, 165 L. Ed. 2d at 240.

The circumstances surrounding Officer Cashwell's interrogation of Carlson objectively indicate that no ongoing emergency existed

and that the primary purpose of the interrogation was to establish or prove past events potentially relevant to a later criminal prosecution. The assault occurred hours before Carlson was discovered, and Carlson's neighbors were with her for a period of time before Officer Cashwell arrived. Although defendant's location was unknown at the time of the interrogation, *Davis* clearly indicates that this fact does not in and of itself create an ongoing emergency. *Id.* at ——, 126 S. Ct. at 2279 n.6, 165 L. Ed. 2d at 243 n.6. Carlson's statements were "neither a cry for help nor the provision of information enabling [Officer Cashwell] immediately to end a threatening situation." *Id.* at ——, 126 S. Ct. at 2279, 165 L. Ed. 2d at 243. Rather, Carlson "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed." *Id.* at ——, 126 S. Ct. at 2278, 165 L. Ed. 2d at 242. As such, Carlson's statements to Officer Cashwell were testimonial, and admission of those statements at trial violated defendant's right to confrontation because she was not afforded an opportunity to cross-examine Carlson.

"A violation of the defendant's rights under the Constitution of the United States is prejudicial unless . . . it was harmless beyond a reasonable doubt." N.C.G.S. § 15A-1443(b) (2005). Because Carlson was the only eyewitness to the crimes, we cannot say "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed. 2d 705, 710 (1967). Likewise, because the identification of defendant as the perpetrator of the crimes depended almost entirely on Carlson's statements and photo identification, we cannot say beyond a reasonable doubt that the total evidence against defendant was so overwhelming that the error was harmless. *See e.g.*, *State v. Tirado*, 358 N.C. 551, 581, 599 S.E.2d.515, 536 (2004), *cert. denied*, 544 U.S. 909, 125 S. Ct. 1600, 161 L. Ed. 2d 285 (2005).

We briefly address the concept of forfeiture, which, in the context of the Confrontation Clause, means that "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." *Davis*, —— U.S. at ——, 126 S. Ct. at 2280, 165 L. Ed. 2d at 244. We are mindful that *Roberts* governed Confrontation Clause analysis at the time of defendant's original trial and the State had little incentive, if any, to argue forfeiture as "[t]he *Roberts* approach to the Confrontation Clause undoubtedly made recourse to [the forfeiture] doctrine less necessary, because prosecutors could show the 'reliability' of *ex parte* statements more easily than they could show the defendant's procurement of the witness's absence."

*Id.* at ——, 126 S. Ct. at 2280, 165 L. Ed. 2d at 244. Indeed, forfeiture has not been raised in this case because, at the court's request and in light of the *Roberts* framework, the State stipulated that Carlson's death was not a result of defendant's actions. Both *Crawford* and *Davis* explicitly reaffirmed that defendants can forfeit their Confrontation Clause rights because "'the rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds.'" *Id.* at ——, 126 S. Ct. at 2280, 165 L. Ed. 2d at 244 (citing *Crawford*, 541 U.S. at 62, 124 S. Ct. at 1370, 158 L. Ed. 2d at 199) (alteration in original)). The parties are, of course, free to develop this issue during defendant's new trial.

## III. DISPOSITION

For the reasons stated above, the opinion of the Court of Appeals granting defendant a new trial is modified and affirmed.

MODIFIED AND AFFIRMED.

Justice HUDSON did not participate in the consideration or decision of this case.