IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-864

Filed 6 May 2026

Buncombe County, Nos. 23CR000245-100, 23CR361973-100, 23CR363093-100, 23CR370343-100

STATE OF NORTH CAROLINA

v.

JOSHUA DALTON PHILLIPS, Defendant.

Appeal by defendant from judgment entered 22 November 2024 by Judge Jacqueline D. Grant in Buncombe County Superior Court. Heard in the Court of Appeals 10 March 2026.

*Attorney General Jeff Jackson, by Assistant Attorney General Herman M. Little, Jr., for the State.*

*The Sweet Law Firm, PLLC, by Kaelyn N. Sweet, for defendant-appellant.*

FLOOD, Judge.

Defendant Joshua Dalton Phillips appeals from his convictions following a jury trial for assault by strangulation, assault on a female, assault with a deadly weapon, communicating a threat, first degree kidnapping, assault inflicting serious bodily injury, and assault by pointing a gun. On appeal, Defendant argues the trial court, first, erred or plainly erred by allowing a substitute expert witness to present hearsay statements in violation of the Confrontation Clause of the Sixth Amendment to the Constitution of the United States, and second, plainly erred by allowing an investigator to vouch for the alleged victim's credibility in violation of Rule 701 of the

North Carolina Rules of Evidence. After careful review, we hold the trial court did not err in allowing the expert to testify regarding the victim's injuries and did not plainly err in allowing the investigator to testify as to whether he believed the victim's story.

## I. **Factual and Procedural Background**

Defendant and his wife, Pearl Phillips, met in January 2019 and were married in July 2020. The couple are parents of one son, born in July 2022. Following an altercation between Defendant and Pearl, Defendant was charged with assault by strangulation, assault on a female, assault with a deadly weapon, communicating a threat, first degree kidnapping, assault inflicting serious bodily injury, and assault by pointing a gun.

Evidence at Defendant's trial tended to show Defendant had introduced Pearl to methamphetamines when the couple met in 2019, but both had stopped using the drug in 2020. Pearl testified that beginning in May 2023, Defendant "started reusing methamphetamines." As a result, by June 2023, Defendant "was not sleeping" for days at a time. Defendant began "accusing [Pearl] of having an affair that [she] was not having," and "was physically beating [her] everyday with punching [her], kicking [her], strangling her . . . [and] sticking guns in [her] face." These incidents occurred during the two weeks leading up to their son's first birthday on 17 July 2023.

On the morning of 17 July 2023, while Pearl was making breakfast for their son's first birthday, Defendant had been "on the back porch smoking

methamphetamines." When Defendant came inside, he claimed he "had seen people walking around in the woods and that these were the people [Pearl] was . . . having an affair with." According to Pearl, Defendant became angry and started beating her with a cane.

Pearl explained that, after the cane broke in half, Defendant "picked up the pieces and started trying to stab [her] with [the pieces]." Pearl testified that, at some point during the altercation, Defendant "was on top of [her] and was strangling [her] and was saying that he was going to kill [her, a]nd when [she] started to lose consciousness, [] he stopped and told [her] that he was the one that was in charge of whether [she] died or lived." Defendant grabbed Pearl by the neck approximately "ten times . . . throughout the morning[,]" "bit [her] on [her] back and on [her] hand," and hit her in the face with a closed fist "[a]t least ten times." The incident ended when the couple's son woke up, and Defendant "told [Pearl] to get up and go and get him."

After Pearl had gotten their son, Defendant started pacing "back and forth in the living room, screaming and saying how he was going to kill [Pearl] and he was going to shoot [her] and he was going to shoot [their son] and make [Pearl] watch." After he described to Pearl what he was going to do, Defendant told her that he "was going to have [Pearl] call 911. And he was going to tell [her] what to say because he was not going to go to prison for killing [her]." When Pearl called 911, she reported that she had seen two strange men walking around the woods next to their house. Pearl testified that before law enforcement arrived, Defendant told her to put on

clothes "that would cover up [her] arms and [her] legs"—a long-sleeved flannel shirt and long blue jeans—and instructed her to "put makeup on [her] face and hands to try to cover up the bruises." When deputies arrived, Defendant told them his wife was "indisposed of" and he did not know what was going on. Seeing nothing of concern at that time, the deputies left shortly after.

A few hours later, Pearl convinced Defendant to let her call 911 again, but not "until [she] had showered the blood off." This time when Pearl called 911, she told dispatchers she was having chest pains and her blood pressure was high. First responders arrived shortly afterward. Upon seeing Pearl's injuries and learning there was a child in the house, first responders contacted the Department of Social Services ("DSS") to remove the child. While Pearl was being evaluated in the ambulance, she told first responders she had fallen down the stairs "because [she] was afraid of what was going to happen to [her] son because he was still inside the house." While en route to the hospital, however, first responders informed Pearl her son was safe in DSS custody. Upon learning her son was safely in the custody of DSS, Pearl felt comfortable enough to tell the first responders about the incidents with Defendant.

Upon arrival at the hospital, Pearl was given an IV and underwent an ultrasound, a CT scan, and an X-ray examination. Pearl was also examined by Sexual Assault Nurse Examiner ("SANE") Tanailly Smith, who took upwards of 140 photographs of Pearl's injuries. Pearl's responses combined with the visual signs of

injury showed, as relevant here, Pearl's injuries were consistent with manual strangulation.

Defendant was subsequently charged with felonious assault by strangulation, assault on a female, assault with a deadly weapon, communicating threats, first degree kidnapping, and assault inflicting serious bodily injury. At the time of Defendant's trial on 18 November 2024, Nurse Smith had moved to South Florida and was unavailable to testify, so the State called her supervisor, SANE Nurse Jacqueline D. Maillet, to testify regarding Pearl's injuries. Nurse Maillet was qualified as an expert in "forensic nurse examination and strangulation assessment."

At trial, Nurse Maillet testified she had reviewed Nurse Smith's examination report independently, including "the charting, photographs, and other documentation that [Nurse] Smith made with Pearl," and reached her own conclusions. Nurse Maillet also reduced her conclusions to writing. Defense counsel objected to Nurse Maillet's testimony, as it was unclear "what part of her opinion was based on somebody else's opinions or statements or observations." The trial court allowed a brief *voir dire* of Nurse Maillet, and, after hearing arguments from the parties, defense counsel renewed his objection asserting Nurse Maillet's expert "conclusions are based on another person's observations who's not present in court." The trial court overruled Defendant's objections and allowed Nurse Maillet's testimony and the admission of Nurse Smith's examination report as State's Exhibit 10.

Based upon her independent review of the photographs, charts, and statements from Pearl, Nurse Maillet concluded that there was evidence of manual strangulation and that Pearl's "injuries are consistent with her statements of being physically punched, kicked, strangled, and beaten with a cane."

The State also called Detective Brian Burns, the lead detective on the case, to testify. Detective Burns testified that on 27 July 2023, he had interviewed Pearl and informed her that Defendant had made "some allegations" regarding her use of methamphetamine. Although Pearl had testified at trial about "doing methamphetamine potentially on June 23rd when she had an overdose," Detective Burns explained that, during the interview, Pearl "entirely denied" using methamphetamine and said, "she [had] never used methamphetamine[.]"

On cross examination, defense counsel asked Detective Burns whether, "[he thought] it was logical that [Pearl was] saying, '[Defendant] has plans to murder me and my kid, and he's making me participate in it. He's making me call 911[,]'" and whether Detective Burns "f[ou]nd that behavior suspicious" when Pearl did not come out to speak with police after the first 911 call. Detective Burns responded, "I don't think it's suspicious. The reason I say that is because victims of domestic violence typically sometimes are scared to act." Given the inconsistencies in Pearl's statements regarding her methamphetamine use, defense counsel asked Detective Burns whether, "after seeing her on the stand, after knowing she has told [him] some lies, do[es he] have any concerns about her truthfulness?" Detective Burns replied, "I

believe she just told me the one lie, to my knowledge. Concerning the charges, I do

not have any concerns about her truthfulness."

The State then asked Detective Burns on redirect examination:

> [The State]: Following the July 27th interview, did you believe that she had been assaulted by the defendant?
>
> [Burns]: I 100 percent did.
>
> [The State]: That she had been confined by the defendant in that house?
>
> [Burns]: Yes.
>
> [The State]: Did you believe her narrative of events concerning being forced to call 911?
>
> [Burns]: Yes.
>
> [The State]: And do you believe her today?
>
> [Burns]: I believe the story Pearl Phillips told me 100 percent and what she told me today.

Defendant did not object to this testimony. On recross examination, defense counsel

asked Detective Burns how he could believe Pearl "a hundred percent if she has

shown that she is willing to lie to you [about her methamphetamine use]?" Detective

Burns explained to the jury:

> I will tell you this. In my training and experience, a mother will do anything they can to protect their child if they think that child is at harm, including lying to the police. I think at that time that, she either forgot about this or -- I don't think she intentionally set to deceive me. I a [sic] hundred percent do not believe she intentionally set out to deceive

me or any other law enforcement officer.

Detective Burns testified that he also observed changes to Pearl's demeanor during this interview, telling the jury:

> I've seen domestic violence victims when they first call 911, and I've seen them weeks and months and even years later . . . [Pearl's] demeanor was definitely one that changed . . . her demeanor was much – much of somebody that had been through a traumatic event[.]

Defendant objected to Detective Burns's interpretation of Pearl's demeanor, which was overruled.

After deliberating for less than two hours, the jury returned a verdict finding Defendant guilty on all charges. That same day, the trial court sentenced Defendant to two consecutive, active judgments. The first judgment was for a minimum term of 92 months and a maximum term of 123 months to be served in the North Carolina Department of Adult Corrections. The second judgment was for a minimum term of 26 months and a maximum term of 44 months to be served at the expiration of the previous term imposed. Defendant timely appealed on 6 December 2024.

## II. <u>Jurisdiction</u>

This Court has jurisdiction to hear Defendant's appeal pursuant to N.C.G.S. §§ 7A-27(b) and 15A-1444(a) (2023).

## III. <u>Analysis</u>

On appeal, Defendant argues the trial court: (A) erred or plainly erred in allowing a substitute expert witness to testify regarding Pearl's hospital examination

findings in violation of Defendant's constitutional guarantee to confront witnesses against him; and (B) plainly erred by allowing the State's lead detective to vouch for the credibility of Pearl, because her credibility as to how she became injured was a critical issue for the jury's consideration. We address each argument in turn.

## A. Confrontation Clause

Defendant first argues the trial court erred or plainly erred in allowing a substitute expert witness, Nurse Maillet, to testify regarding Pearl's hospital examination findings in violation of Defendant's constitutional guarantee to confront witnesses against him.

### 1. Standard of Review and Preservation

"We review preserved violations of constitutional rights de novo." *State v. Diaz*, 256 N.C. App. 528, 531 (2017) (citing *State v. Graham*, 200 N.C. App. 204, 214 (2009)), a*ff'd in part, rev'd in part on other grounds*, 372 N.C. 493 (2019). "Under a de novo review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632–33 (2008) (citation and internal quotations omitted).

To preserve an issue for appellate review, however, "a party must have presented to the trial court a timely request, objection, or motion, *stating the specific grounds* for the ruling the party desired the court to make *if the specific grounds were not apparent from the context.*" *State v. Ortiz-Zape*, 367 N.C. 1, 10 (2013) (emphasis added) (quoting N.C. R. App. P. 10(a)(1)).

Here, Defendant contends this issue is preserved for appellate review because he objected "when [] Nurse Maillet testified that she had not seen the patient 'in real time' because Nurse Smith had conducted [Pearl's] examination"; when the State attempted to introduce the hospital report; and during *voir dire* when defense counsel argued he was unable to "'cross-examine [Nurse Maillet] on her methodology, her training, her experience, any of that' because she had not written the report." Defendant argues in the alternative that, should this Court determine this issue is not preserved, Defendant "specifically and distinctly requests th[is] Court consider this issue under plain error review."

Although Defendant did not explicitly cite the Sixth Amendment's Confrontation Clause in his objections, the grounds for Defendant's objections are "apparent from the context," *see* N.C. R. App. P. 10 (a)(1) (2025), as his counsel's objections were grounded in Defendant's inability to cross examine a witness on hearsay statements; thus, we hold this issue is preserved for appellate review. *See Ortiz-Zape*, 367 N.C. at 11 (concluding the defendant's objection was properly preserved because, "[b]ased on defendant's arguments at the earlier voir dire hearing, it is clear that this objection was based on the Confrontation Clause"). Accordingly, we will review this issue de novo. *See Diaz*, 256 N.C. App. at 531.

### *2. Discussion*

"The Sixth Amendment's Confrontation Clause provides that, in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses

against him." *Crawford v. Washington*, 541 U.S. 36, 42 (2004) (citation modified). "[T]o implicate the Confrontation Clause, a statement must meet two criteria; namely, the statement must [1] be hearsay ('for the truth') and [2] it must be testimonial." *State v. Clark*, 296 N.C. App. 718, 721 (2024) (citation and internal quotation marks omitted), *disc. review allowed,* 923 S.E.2d 225 (N.C. 2025).

In *Smith v. Arizona*, the Supreme Court of the United States established, "[i]f an expert for the prosecution conveys an out-of-court statement in support of his opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts" and is therefore hearsay. 602 U.S. 779, 795 (2024). Otherwise, the "jury cannot decide whether the expert's opinion is credible without evaluating the truth of the factual assertions on which it is based." *Id.* at 796. Thus, the Supreme Court determined that a defendant's rights under the Confrontation Clause are implicated when the opinion testimony of a surrogate expert was based "upon the 'testimonial hearsay' statements contained in a lab report or notes prepared by another analyst who" performed the test. *Clark*, 296 N.C. App. at 720. Conversely, the defendant's rights under the Confrontation Clause are not violated where the testifying expert's opinion is the product of their own independent observation and analysis of objective data without the need for reliance on the absent expert's statements. *See Smith*, 602 U.S. at 799.

Testimonial statements, in turn, are those "that were made under circumstances which would lead an objective witness reasonably to believe that the

statement would be available for use at a later trial." *Crawford*, 541 U.S. at 52; *see also Davis v. Washington*, 547 U.S. 813, 822 (2006) (characterizing statements as testimonial "when the circumstances objectively indicate that there is no such ongoing emergency," and the primary purpose of the statements are "to establish or prove past events potentially relevant to later criminal prosecution"). The Constitution bars such testimonial hearsay statements for a witness that did not appear at trial "unless [(1) the witness] was unavailable to testify, and [(2)] the defendant [] had a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 54.

In *State v. Ball*, this Court addressed the admissibility of a SANE examination report under the Confrontation Clause in a case with strikingly similar facts to the present case. 292 N.C. App. 151 (2024). In *Ball*, the rape victim was given a SANE examination by a Nurse Sullivan. *Id.* at 155. At trial, however, the State called Nurse Sullivan's supervisor, Nurse Maillet,[1] to testify "regarding the SANE exam report, which was performed by Nurse Sullivan[.]" *Id.*

> Nurse Maillet testified she personally reviewed [the victim]'s SANE exam report and concluded the examination was conducted in accordance with the proper protocols governing all sexual assault examinations. Nurse Maillet further explained that part of the general protocol governing all sexual assault examinations is for the examining nurse to take photographs of nearly every part of the patient's body. Nurse Maillet *personally reviewed the photographs* taken during [the victim]'s examination, and

---

[1] We note this is the very same 'Nurse Maillet' who testified at Defendant's trial here.

she observed bruising, abrasions and redness in the photographs that were 'consistent with blunt trauma, which is what happens during a sexual assault.' In connection with Nurse Maillet's testimony, the SANE exam report was admitted into evidence at trial[.]

*Id.* at 156 (emphasis added).

On appeal, the defendant argued "the trial court plainly erred in admitting the SANE exam report prepared by Nurse Sullivan and in allowing Nurse Maillet to provide 'surrogate testimony for [Nurse] Sullivan, in violation of the Confrontation Clause.'" *Id.* at 159. This Court disagreed, explaining that, while "forensic analyses qualify as testimonial statements subject to the Confrontation Clause[,]" "the Confrontation Clause is subject to several exceptions that limit its applicability, including that testimonial statements will not be barred when they are admitted for 'purposes other than establishing the truth of the matter asserted.'" *Id.* at 160 (quoting *Crawford*, 541 U.S. at 60 n.9.). Thus, this Court explained, "[a]n expert witness may testify as to the testing or analysis conducted by another expert if: (i) that information is reasonably relied on by experts in the field in forming their opinions;" and "(ii) the testifying expert witness independently reviewed the information and reached his or her own conclusion in the case." *Id.* at 161 (citation modified). We emphasized, however, "the expert must present an independent opinion obtained through his or her own analysis and not merely 'surrogate testimony' parroting otherwise inadmissible statements." *Id.* (citation omitted).

Ultimately, we held the trial court "did not err, much less plainly err, in admitting the SANE exam report and in allowing Nurse Maillet's testimony." *Id.* at 162. We explained that because Nurse Maillet's testimony in *Ball* described the standard protocol for all SANE examinations, "including taking photographs of areas on the body"; "[she] testified, in her review of the photographs indicating bruising," that "the injury she observed 'is consistent with blunt trauma, which is what happens during a sexual assault"; and "then provided her own *independent opinion of the images* taken during [the victim]'s examination showing injury to [the victim]'s body[,]" we reasoned, "Nurse Maillet's testimony was based upon her personal knowledge and her professional judgement in her independent review of the information from the SANE exam report. *Id.* "Hence, Nurse Maillet's opinion was her own independently reasoned opinion and did not serve as surrogate testimony parroting the testing analyst's opinion." *Id.* at 162 (citation and internal quotation marks omitted).

We find the reasoning in *Ball* to be persuasive in the present case. First, as in *Ball*, Nurse Maillet testified here that she, as the supervising nurse of the forensic nurse team at Mission Hospital, personally reviewed Nurse Smith's report and had determined Nurse Smith followed the proper procedures when conducting Pearl's exam. Nurse Maillet also testified that the information in Nurse Smith's report was the type she regularly relied on "as an expert in the field" and she had "independently review[ed] that information and reach[ed] [] conclusions of [her] own" before reducing

those conclusions to writing. Like her testimony regarding the standard protocol for SANE examinations in *Ball*, Nurse Maillet explained the standard protocol for a domestic violence/intimate partner violence ("DV/IVP") examination includes "talking with patients" and "photographing patients" and is essentially "the same head-to-toe assessment, looking for injury or injury pattern. [The DV/IVP] just may or may not involve a pelvic exam[.]" Importantly, Nurse Smith had taken "about 144, 145" photos of Pearl's injuries, capturing "all sides of her and all four planes." When Nurse Maillet reviewed these photos, she observed bruises on Pearl's face, eyes, and along her jawline; abrasions on her neck and chin "that are consistent with the patient trying to pull hands off their neck, and then they accidentally scratch themselves"; and "circular bruises" on Pearl's jaw that are consistent with "Pearl's statement of being grabbed by two hands[.]" As in *Ball*, if Nurse Maillet could determine here, by looking at the photographs taken during the examination that Pearl had been strangled, then Nurse Maillet "provided her own independent opinion of the *images* taken during [the victim]'s examination showing injury to [the victim]'s body" to reach her conclusion. *See id.* at 161 (emphasis added). Stated another way, if Nurse Maillet concluded by examining the machine-generated output of the camera used to produce the photos that Pearl was strangled, then the Confrontation Clause is not implicated. "Machines are not 'person[s]' and so do not rank as hearsay 'declarants.' Their raw output—*much like a photograph*—is the product of 'mechanical procedures' rather than an intentional assertion of fact." *State v. Lester*,

387 N.C. 90, 98–99 (2025) (emphasis added) (citing N.C.G.S. § 8C-1, Rule 801(b) (2023)). Notably, counsel for Defendant agreed during *voir dire* of Nurse Maillet that the photographs themselves were admissible, stating, "I don't think I have the same argument that she needs to be an expert to take photographs . . . . [A]nd I would concede that."

Crucially, however, neither Nurse Smith's report, nor Nurse Maillet's written opinion based on Nurse Smith's report and photos, are contained in the Record on appeal.[2] Since "[t]his Court's review on appeal is limited to what is in the record[,]" *State v. Moore*, 75 N.C. App. 543, 548 (1985), we are therefore unable to discern which portions, if any, of Nurse Smith's *statements* formed the "basis" of Nurse Maillet's conclusion that Pearl was strangled such that Nurse Smith's statements could be said to have been offered for their truth, thus implicating the Confrontation Clause, *see Smith*, 602 U.S. at 795 ("There is no meaningful distinction between disclosing an out-of-court statement to 'explain the basis of an expert's opinion' and 'disclosing that statement for its truth.'" (citation omitted)).

Nevertheless, "[a] ruling of the trial court on an evidentiary point is presumptively correct, and [an appellant] asserting prejudicial error must demonstrate that the particular ruling was in fact incorrect." *State v. Milby*, 302 N.C.

---

[2] According to the transcript, the State presented approximately "40 or 50" of the photos at trial, but these pictures are not in the Record on appeal. The Record does contain the slideshow presented to the jury during the State's closing argument, which includes a handful of the SANE exam photographs, but the images are of very poor quality and without color.

137, 141 (1981). "Where the matter complained of does not appear of record, [the] appellant has failed to make the irregularity manifest and it will not be considered as a basis for prejudicial error." *Id.* From the Record before us, Nurse Maillet's conclusion—specifically, that Pearl's injuries were consistent with manual strangulation—appears to be based on her own independent review of the photographs taken during the SANE examination, without reliance on any factual assertions by Nurse Smith. In the absence of Record evidence to the contrary, therefore, we are constrained to hold the trial court did not err in allowing Nurse Maillet's testimony. *See id.*; *see also State v. Williams*, 274 N.C. 328, 333 (1968) ("An appellate court is not required to, and should not, assume error by the trial judge when none appears on the record before the appellate court."); *State v. Alston*, 307 N.C. 321, 341 (1983) ("It is the appellant's duty and responsibility to see that the record is in proper form and complete." (citation omitted)).

Although we hold the trial court did not err in allowing Nurse Maillet to testify regarding Pearl's examination, we emphasize that our holding is limited to those cases in which the underlying data relied on by the out-of-court expert to reach his or her ultimate conclusion can be independently examined and its accuracy verified by the testifying expert, who is subject to cross examination. Our holding is distinguishable from the line of cases that have found the Confrontation Clause to be violated where a testifying expert must rely on the truth of an absent expert's *statements* to reach his or her conclusions. *See Smith*, 602 U.S. at 798 (holding the

Confrontation Clause was violated where all of the testifying expert's opinions "were predicated on the truth of [the absent expert's] factual statements[,]" and the testifying expert "could opine that the tested substances were marijuana, methamphetamine, and cannabis only because he accepted the truth of what [the absent expert] had reported about her work in the lab"). In the context of drug analysis or DNA testing, for example, the accuracy of the results testified to depends on the fact that the absent analyst performed the tests correctly, and whether that fact is true depends on whether the absent expert properly applied her specialized skill and training. *See, e.g.*, *State v. Tate*, 299 N.C. App. 507, 526 (2025); *Clark*, 296 N.C. App. at 722; *State v. Craven*, 367 N.C. 51, 53 (2013). In such instances, the "truth" of those test results cannot be verified without cross examination of the person who performed the tests. Conversely, a photograph speaks for itself, and thus its "accuracy" does not depend on the truth of any factual assertions. *See State v. Patterson*, 332 N.C. 409, 418 (1992) (holding composite pictures, which are "the functional equivalent of a photograph[,]" is not hearsay). "Because computer-generated data are the fruit of self-sufficient and automated processes, they are the machine's work alone. It is this independence—this freedom from human influence or interpretation—that makes computer-generated data distinct." *Lester*, 387 N.C. at 98 (internal citation omitted).

### 3. Prejudice

We briefly note, although the Record is insufficient for us to hold the trial court erred in allowing Nurse Maillet's testimony, presuming *arguendo* that some portions of Nurse Maillet's testimony violated Defendant's right to confrontation, we nonetheless conclude the error, if any, was harmless. *Cf. Tate*, 299 N.C. App. at 532 ("Recognizing the evolving state of the law . . . in this type of case, as a second and independent basis for our decision, if the [d]efendant's confrontation rights were violated by the [expert's testimony], this violation only amounts to harmless error."). "Our Supreme Court has held admissions of testimonial evidence will be construed as 'harmless error' in relation to an alleged Confrontation Clause violation where there is 'other competent overwhelming evidence of [the] defendant's guilt[.]'" *Id.* (alterations in original) (quoting *State v. Lewis*, 361 N.C. 541, 544 (2007)).

Here, Defendant argues in one paragraph that he was prejudiced by the admission of Nurse Maillet's testimony because, as the "only medical witness" at Defendant's trial, "[w]ithout her testimony that [Pearl's] injuries 'caused or potentially caused permanent disfigurement or scarring,' or 'permanent or protracted loss of bodily function[,]'" the State would have been unable to show "beyond a reasonable doubt" that Defendant "was guilty of inflicting various degrees of physical injury upon" Pearl. We conclude this argument lacks merit.

First, it is unclear from Defendant's argument which charges or elements would have required the State to prove "permanent disfigurement or scarring" or "permanent or protracted loss of bodily function." Moreover, Pearl herself testified to

- 19 -

the "various degrees of physical injury" Defendant inflicted upon her. Next, Defendant offered two alternate theories of Pearl's injuries: she had fallen down the stairs or fallen in the shower. Even if the jury had been inclined to believe either of these theories, it is unclear how Nurse Maillet's testimony as to the "permanency" of Pearl's injuries made it more or less likely that Pearl's injuries resulted from an attack by Defendant, rather than a bad fall. Lastly, the photographs themselves— which, as explained above, were concededly admissible—were sufficient to show and for the jury to determine the severity of Pearl's injuries, irrespective of any statements by Nurse Maillet.

Taking this evidence as a whole, we conclude the State offered "other competent overwhelming evidence of [D]efendant's guilt." *Lewis*, 361 N.C. at 544; *see Tate*, 299 N.C. App. at 533 (explaining that, because "there was substantial evidence to convict [the d]efendant [], even without the testimony of" the expert, "[e]ven if [the d]efendant's Confrontation Clause rights were implicated, the admission of [the expert's] testimony amounts only to harmless error"). Accordingly, presuming *arguendo* some portions of Nurse Maillet's testimony were admitted in error, Defendant was not prejudiced by their admission; thus, any potential error was harmless. *See Tate*, 299 N.C. App. at 532.

## B. Improper Vouching Testimony

Defendant next argues the trial court plainly erred by allowing the State's lead detective, Detective Burns, to vouch for the credibility of Pearl, because her credibility as to how she became injured was a critical issue for the jury's consideration.

### 1. Standard of Review and Preservation

This Court ordinarily "review[s] a trial court's ruling on the admissibility of lay opinion testimony for abuse of discretion." *State v. Belk*, 201 N.C. App. 412, 417 (2009). Defendant, however, did not object to Detective Burns's testimony; thus, Defendant has failed to preserve this issue for appellate review. *See State v. Reber*, 386 N.C. 153, 157 (2024) ("Without an objection, that error is deemed unpreserved, and the issue is therefore waived on appeal." (quoting *State v. Lawrence*, 365 N.C. 506, 512 (2012))). "[T]his Court reviews unpreserved evidentiary objections for plain error." *State v. Thompson*, 273 N.C. App. 686, 690 (2020).

"For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial." *Lawrence*, 365 N.C. at 518. "To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty." *Id.* (citation and internal quotation marks omitted). "Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal citations and quotation marks omitted). Thus, plain error should only be found where the claimed error is

"something so basic, so prejudicial, so lacking in its elements that justice cannot have been done," or "where the error is grave error which amounts to a denial of a fundamental right of the accused, or the error has resulted in a miscarriage of justice or in the denial to appellant of a fair trial." *Ball*, 292 N.C. App. at 160 (citation omitted).

Here, Defendant "specifically and distinctly contends that the trial court's admission of Detective Burns'[s] testimony on the parties' credibility constituted plain error." Accordingly, we will review this issue for plain error. *See Thompson*, 273 N.C. App. at 690.

## *2. Discussion*

North Carolina Rule of Evidence 701 governs lay opinion testimony. Rule 701 provides:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

N.C.G.S. § 8C-1, Rule 701 (2023). Under Rule 701, "[i]t is improper for one witness to vouch for the veracity of another." *State v. Bellamy*, 172 N.C. App. 649, 663 (2005) (citing *State v. Robinson*, 355 N.C. 320, 334–35 (2002)). Thus, "[t]he admission of opinion testimony intended to bolster or vouch for the credibility of another witness violates [Rule 701]." *State v. Harris*, 236 N.C. App. 388, 403 (2014). Moreover, our

Supreme Court has held that "the trial court commits a fundamental error when it allows testimony which vouches for the complainant's credibility in a case where the verdict entirely depends upon the jurors' comparative assessment of the complainant's and the defendant's credibility." *State v. Warden*, 376 N.C. 503, 504 (2020).

Nevertheless, "a trial court may permit otherwise inadmissible evidence to be admitted if the opposing party opens the door through cross-examination of the witness." *State v. Thaggard*, 168 N.C. App. 263, 273 (2005) (citation omitted). "'Opening the door' is the principle where one party introduces evidence of a particular fact and the opposing party may introduce evidence to explain or rebut it, even though the rebuttal evidence would be incompetent or irrelevant, if offered initially." *Id.*

Here, Defendant contends the trial court plainly erred in allowing Detective Burns to testify as to whether he believed Pearl's story about her injuries. Specifically, Defendant argues "although whether an officer believes a witness is telling them the truth certainly may influence his or her decision-making in an investigation, that issue was not raised by the questioning in this case"; therefore, "Detective Burns'[s] statements were not offered for a proper purpose" and were admitted in plain error. The State, in turn, argues that, because "it was Defendant's counsel who specifically asked Detective Burns whether [Pearl's] prior statements

during his investigation were logical[,]" Defendant "opened the door for Detective Burns to comment on [Pearl's] credibility." We agree with the State.

This Court's decision in *Thaggard* is illustrative. In *Thaggard*, the prosecution asked the child victims' treating physician on direct examination, "based on your training and experience and your examination of the two girls, . . . do you think that the two girls just got together and told each other what to say to you?" 168 N.C. App. at 274. Following an objection by the defendant, which the trial court overruled, the physician responded, "No. No, I don't." *Id.* On appeal, the defendant argued "the trial court committed prejudicial error by admitting opinion testimony from a medical expert that the victims were truthful." *Id.* at 273. This Court agreed, concluding the "testimony was an impermissible comment by an expert medical witness on the credibility of the two prosecuting witnesses." *Id.* at 274. Because "[t]he State's question and [the witness's] answer sp[oke] directly to the credibility of the victims' testimony[,]" the testimony should have been excluded unless "[the] defendant 'opened the door' by addressing the victims' credibility on cross-examination." *Id.* We noted, however, "[t]his opinion was expressed on *direct examination* of [the witness] during the State's case-in-chief *before* [the] defendant had the opportunity to 'open the door[.]'" *Id.* (emphasis added). As such, this Court held the trial court prejudicially erred in admitting the expert's testimony. *Id.*

We find the reasoning in *Thaggard* distinguishable and conclude the trial court did not err—much less plainly err—in admitting Detective Burns's testimony about

whether he believed Pearl's story. Unlike the defendant in *Thaggard*, the transcript here reveals no questioning by the State nor testimony from Detective Burns regarding Pearl's credibility or believability prior to redirect examination; rather, the first mention of Pearl's credibility was by Defendant's own trial counsel on cross examination, when he asked Detective Burns, "Did you believe her when she said [Defendant was plotting to kill her]?"

In fact, Defendant concedes in his brief that "counsel for [*Defendant*] worked to undermine [Pearl's] credibility on cross examination by illustrating inconsistencies in her prior statements to law enforcement and eliciting her admission that she added certain details to the account of her injuries only after the Department of Social Services became involved." (Emphasis added.)

Because Defendant's trial counsel was the first to question Detective Burns on the believability of Pearl's story, we conclude Defendant "'opened the door' by addressing the victim['s] credibility on cross-examination," thereby allowing the State to introduce evidence to rebut defense counsel's implications. *See id.*; *see also State v. Warren*, 347 N.C. 309, 317 (1997) ("The law wisely permits evidence not otherwise admissible to be offered to explain or rebut evidence elicited by the defendant himself." (citation and internal quotation marks omitted)). Consequently, we hold the trial court did not err, much less plainly err, in allowing the State to offer rebuttal testimony regarding Pearl's credibility after Defendant had opened the door.

## IV. Conclusion

After careful review, we hold the trial court did not err in allowing Nurse Maillet to testify regarding Pearl's injuries. Nor did the trial court err, let alone plainly err, in allowing Detective Burns to testify as to whether he believed Pearl's story after Defendant had opened the door. Accordingly, we deny Defendant's request for a new trial.

NO ERROR.

Judges TYSON and CARPENTER concur.